(Slip Opinion) OCTOBER TERM, 2004 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MCCREARY COUNTY, KENTUCKY, ET AL. *v*. AMERI-CAN CIVIL LIBERTIES UNION OF KENTUCKY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 03–1693. Argued March 2, 2005—Decided June 27, 2005

After petitioners, two Kentucky Counties, each posted large, readily visible copies of the Ten Commandments in their courthouses, respondents, the American Civil Liberties Union (ACLU) et al., sued under 42 U. S. C. §1983 to enjoin the displays on the ground that they violated the First Amendment's Establishment Clause. The Counties then adopted nearly identical resolutions calling for a more extensive exhibit meant to show that the Commandments are Kentucky's "precedent legal code." The resolutions noted several grounds for taking that position, including the state legislature's acknowledgment of Christ as the "Prince of Ethics." The displays around the Commandments were modified to include eight smaller, historical documents containing religious references as their sole common element, *e.g.,* the Declaration of Independence's "endowed by their Creator" passage. Entering a preliminary injunction, the District Court followed the *Lemon* v. *Kurtzman,* 403 U. S. 602, test to find, *inter alia*, that the original display lacked any secular purpose because the Commandments are a distinctly religious document, and that the second version lacked such a purpose because the Counties narrowly tailored their selection of foundational documents to those specifically referring to Christianity. After changing counsel, the Counties revised the exhibits again. No new resolution authorized the new exhibits, nor did the Counties repeal the resolutions that preceded the second one. The new posting, entitled "The Foundations of American Law and Government Display," consists of nine framed documents of equal size. One sets out the Commandments explicitly identified as the "King James Version," quotes them at greater length, and explains that they have profoundly influenced the formation of Western legal

2    MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Syllabus

thought and this Nation.  With the Commandments are framed copies of, *e.g.,* the Star Spangled Banner's lyrics and the Declaration of Independence, accompanied by statements about their historical and legal significance.  On the ACLU's motion, the District Court included this third display in the injunction despite the Counties' professed intent to show that the Commandments were part of the foundation of American Law and Government and to educate County citizens as to the documents.  The court took proclaiming the Commandments' foundational value as a religious, rather than secular, purpose under *Stone* v. *Graham,* 449 U. S. 39, and found that the Counties' asserted educational goals crumbled upon an examination of this litigation's history.  Affirming, the Sixth Circuit stressed that, under *Stone*, displaying the Commandments bespeaks a religious object unless they are integrated with a secular message.  The court saw no integration here because of a lack of a demonstrated analytical or historical connection between the Commandments and the other documents.

*Held:*

   1. A determination of the Counties' purpose is a sound basis for ruling on the Establishment Clause complaints.  The Counties' objective may be dispositive of the constitutional enquiry.  Pp. 10–19.

   (a) *Lemon*'s "secular legislative purpose" enquiry, 403 U. S., at 612, has been a common, albeit seldom dispositive, element of this Court's cases, *Wallace* v. *Jaffree,* 472 U. S. 38, 75.  When the government acts with the ostensible and predominant purpose of advancing religion, it violates the central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides. *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327, 335.  A purpose to favor one faith over another, or adherence to religion generally, clashes with the "understanding . . . that liberty and social stability demand a . . . tolerance that respects the religious views of all citizens." *Zelman* v. *Simmons-Harris,* 536 U. S. 639, 718.  Pp. 11–12.

   (b) The Court declines the Counties' request to abandon *Lemon*'s purpose test.  Their assertions that true "purpose" is unknowable, and its search merely an excuse for courts to act selectively and unpredictably in picking out evidence of subjective intent, are as seismic as they are unconvincing.  Examination of purpose is a staple of statutory interpretation for every American appellate court, *e.g., General Dynamics Land Systems, Inc.* v. *Cline,* 540 U. S. 581, 600, and governmental purpose is a key element of a good deal of constitutional doctrine, *e.g.*, *Washington* v. *Davis,* 426 U. S. 229.  Scrutinizing purpose makes practical sense in Establishment Clause analysis,

where an understanding of official objective emerges from readily discoverable fact set forth in a statute's text, legislative history, and implementation or comparable official act. *Wallace* v. *Jaffree,* 472 U. S., at 73–74. Nor is there any indication that the purpose enquiry is rigged in practice to finding a religious purpose dominant every time a case is filed. Pp. 12–15.

(c) The Court also avoids the Counties' alternative tack of trivializing the purpose enquiry. They would read the Court's cases as if the enquiry were so naive that any transparent claim to secularity would satisfy it, and they would cut context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances. There is no precedent for these arguments, or reason supporting them. Pp. 15–19.

(1) A legislature's stated reasons will generally warrant the deference owed in the first instance to such official claims, but *Lemon* requires the secular purpose to be genuine, not a sham, and not merely secondary to a religious objective, see, *e.g., Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 308. In those unusual cases where the claim was an apparent sham, or the secular purpose secondary, the unsurprising results have been findings of no adequate secular object, as against a predominantly religious one. See*, e.g., Stone, supra*, at 41. Pp. 15–17.

(2) The Counties' argument that purpose in a case like this should be inferred only from the latest in a series of governmental actions, however close they may all be in time and subject, bucks common sense. Reasonable observers have reasonable memories, and the Court's precedents sensibly forbid an observer "to turn a blind eye to the context in which [the] policy arose." *Santa Fe, supra*, at 315. Pp. 17–19.

2. Evaluation of the Counties' claim of secular purpose for the ultimate displays may take their evolution into account. The development of the presentation should be considered in determining its purpose. Pp. 19–26.

(a) *Stone* is the Court's initial benchmark as its only case dealing with the constitutionality of displaying the Commandments. It recognized that the Commandments are an "instrument of religion" and that, at least on the facts before the Court, their text's display could presumptively be understood as meant to advance religion: although state law specifically required their posting in classrooms, their isolated exhibition did not allow even for an argument that secular education explained their being there. 449 U. S., at 41, n. 3. But *Stone* did not purport to decide the constitutionality of every possible way the government might set out the Commandments, and under the Establishment Clause detail is key, *County of Allegheny* v. *American*

4    MᴄCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Syllabus

*Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 595. Hence, the Court looks to the record showing the progression leading up to the Commandments' third display, beginning with the first. Pp. 19–20.

(b) There are two obvious similarities between the display *Stone* rejected and the first one here: both set out the Commandments' text as distinct from any traditionally symbolic representation like blank tablets, and each stood alone, not as part of an arguably secular display. *Stone* stressed the significance of integrating the Commandments into a secular scheme to forestall the broadcast of an otherwise clearly religious message, 449 U. S., at 42, and for good reason, the Commandments being a central point of reference in the religious and moral history of Jews and Christians. They proclaim the existence of a monotheistic god (no other gods), regulate details of religious obligation (no graven images, sabbath breaking, or vain oath swearing), and unmistakably rest even the universally accepted prohibitions (as against murder, theft, etc.) on the sanction of the divinity proclaimed at the text's beginning. Displaying that text is thus different from symbolic representation, like tablets with 10 roman numerals, which could be seen as alluding to a general notion of law, not a sectarian conception of faith. Where the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting a message going beyond an excuse to promote the religious point of view. The display in *Stone* had no such context, and the Counties' solo exhibit here did nothing more to counter the sectarian implication than the *Stone* postings. The reasonable observer could only think that the Counties meant to emphasize and celebrate the Commandments' religious message. Pp. 20–21.

(c) The Counties' second display, unlike the first, did not hang the Commandments in isolation, but included the statement of the government's purpose expressly set out in the county resolutions, and underscored it by juxtaposing the Commandments to other documents whose references to God were highlighted as their sole common element. The display's unstinting focus was on religious passages, showing that the Counties posted the Commandments precisely because of their sectarian content. That demonstration of the government's objective was enhanced by serial religious references and the accompanying resolutions' claim about the embodiment of ethics in Christ. Together, the display and resolution presented an indisputable, and undisputed, showing of an impermissible purpose. Pp. 21–22.

(d) The lower courts' conclusion that no legitimizing secular purpose prompted the Counties' third display, the "Foundations of American Law and Government" exhibit, is amply justified. That dis-

play placed the Commandments in the company of other documents the Counties deemed especially significant in the historical foundation of American government. In trying to persuade the District Court to lift the preliminary injunction, the Counties cited several new purposes for the third version, including a desire to educate County citizens as to the significance of the documents displayed. The Counties' claims, however, persuaded neither that court, which was intimately familiar with this litigation's details, nor the Sixth Circuit. Where both lower courts were unable to discern an arguably valid secular purpose, this Court normally should hesitate to find one. *Edwards* v. *Aguillard*, 482 U. S. 578, 594. The Counties' new statements of purpose were presented only as a litigating position, there being no further authorizing resolutions by the Counties' governing boards. And although repeal of the earlier county authorizations would not have erased them from the record of evidence bearing on current purpose, the extraordinary resolutions for the second displays passed just months earlier were not repealed or otherwise repudiated. Indeed, the sectarian spirit of the resolutions found enhanced expression in the third display, which quoted more of the Commandment's purely religious language than the first two displays had done. No reasonable observer, therefore, could accept the claim that the Counties had cast off the objective so unmistakable in the earlier displays. Nor did the selection of posted material suggest a clear theme that might prevail over evidence of the continuing religious object. For example, it is at least odd in a collection of documents said to be "foundational" to include a patriotic anthem, but to omit the Fourteenth Amendment, the most significant structural provision adopted since the original framing. An observer would probably suspect the Counties of reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality. Pp. 22–25.

(e) In holding that the preliminary injunction was adequately supported by evidence that the Counties' purpose had not changed at the third stage, the Court does not decide that the Counties' past actions forever taint any effort on their part to deal with the subject matter. The Court holds only that purpose is to be taken seriously under the Establishment Clause and is to be understood in light of context. District courts are fully capable of adjusting preliminary relief to take account of genuine changes in constitutionally significant conditions. Nor does the Court hold that a sacred text can never be integrated constitutionally into a governmental display on law or history. Its own courtroom frieze depicts Moses holding tablets exhibiting a portion of the secularly phrased Commandments; in the company of 17 other lawgivers, most of them secular figures, there is no

Syllabus

risk that Moses would strike an observer as evidence that the National Government was violating religious neutrality.  P. 26.

354 F. 3d 438, affirmed.

SOUTER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined.  O'CONNOR, J., filed a concurring opinion.  SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, and in which KENNEDY, J., joined as to Parts II and III.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 03–1693

MCCREARY COUNTY, KENTUCKY, ET AL., PETI-
TIONERS *v.* AMERICAN CIVIL LIBERTIES
UNION OF KENTUCKY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 27, 2005]

JUSTICE SOUTER delivered the opinion of the Court.

Executives of two counties posted a version of the Ten Commandments on the walls of their courthouses. After suits were filed charging violations of the Establishment Clause, the legislative body of each county adopted a resolution calling for a more extensive exhibit meant to show that the Commandments are Kentucky's "precedent legal code," Def. Exh. 1 in Memorandum in Support of Defendants' Motion to Dismiss in Civ. A. No. 99–507, p. 1 (ED Ky.) (hereinafter Def. Exh. 1). The result in each instance was a modified display of the Commandments surrounded by texts containing religious references as their sole common element. After changing counsel, the counties revised the exhibits again by eliminating some documents, expanding the text set out in another, and adding some new ones.

The issues are whether a determination of the counties' purpose is a sound basis for ruling on the Establishment Clause complaints, and whether evaluation of the counties' claim of secular purpose for the ultimate displays

2    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

may take their evolution into account.  We hold that the counties' manifest objective may be dispositive of the constitutional enquiry, and that the development of the presentation should be considered when determining its purpose.

I

In the summer of 1999, petitioners McCreary County and Pulaski County, Kentucky (hereinafter Counties), put up in their respective courthouses large, gold-framed copies of an abridged text of the King James version of the Ten Commandments, including a citation to the Book of Exodus.[1]  In McCreary County, the placement of the Commandments responded to an order of the county legislative body requiring "the display [to] be posted in 'a very high traffic area' of the courthouse."  96 F. Supp. 2d 679, 684 (ED Ky. 2000).  In Pulaski County, amidst reported controversy over the propriety of the display, the Commandments were hung in a ceremony presided over by the county Judge-Executive, who called them "good rules to live by" and who recounted the story of an astronaut who became convinced "there must be a divine God" after viewing the Earth from the moon.  Dodson, Commonwealth Journal, Jul. 25, 1999, p. A1, col. 2, in Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction in Civ. A. No. 99–509 (ED Ky.) (internal quotation marks omitted).  The Judge-Executive was accompanied by the pastor of his church, who called the Commandments "a creed of ethics" and told the press after the ceremony that displaying the Commandments was "one of the greatest things the judge could have done to close out the millennium."  *Id.,* at A2, col. 3 (internal

---

[1] We do not consider here a display of the Ten Commandments in schoolrooms in Harlan County, Kentucky, that was litigated in consolidated proceedings in the District Court and Court of Appeals.  That display is the subject of a separate petition to this Court.

quotation marks omitted). In both counties, this was the version of the Commandments posted:

> "Thou shalt have no other gods before me.
> "Thou shalt not make unto thee any graven images.
> "Thou shalt not take the name of the Lord thy God in vain.
> "Remember the sabbath day, to keep it holy.
> "Honor thy father and thy mother.
> "Thou shalt not kill.
> "Thou shalt not commit adultery.
> "Thou shalt not steal.
> "Thou shalt not bear false witness.
> "Thou shalt not covet.
> "Exodus 20:3–17."[2] Def. Exh. 9 in Memorandum in Support of Defendants' Motion to Dismiss in Civ. A. No. 99–507 (ED Ky.) (hereinafter Def. Exh. 9).

In each county, the hallway display was "readily visible to . . . county citizens who use the courthouse to conduct their civic business, to obtain or renew driver's licenses and permits, to register cars, to pay local taxes, and to register to vote." 96 F. Supp. 2d., at 684; *American Civil Liberties Union of Kentucky* v. *Pulaski County, Kentucky,* 96 F. Supp. 2d 691, 695 (ED Ky. 2000).

In November 1999, respondents American Civil Liberties Union of Kentucky et al. sued the Counties in Federal District Court under Rev. Stat. §1979, 42 U. S. C. §1983, and sought a preliminary injunction against maintaining the displays, which the ACLU charged were violations of the prohibition of religious establishment included in the

---

[2] This text comes from a record exhibit showing the Pulaski County Commandments that were part of the County's first and second displays. The District Court found that the displays in each County were functionally identical. 96 F. Supp. 2d 679, 682, n. 2 (ED Ky. 2000); 96 F. Supp. 2d 691, 693, n. 2 (ED Ky. 2000).

4    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

First Amendment of the Constitution.[3]  Within a month,
and before the District Court had responded to the request
for injunction, the legislative body of each County author-
ized a second, expanded display, by nearly identical reso-
lutions reciting that the Ten Commandments are "the
precedent legal code upon which the civil and criminal
codes of . . . Kentucky are founded," and stating several
grounds for taking that position: that "the Ten Com-
mandments are codified in Kentucky's civil and criminal
laws"; that the Kentucky House of Representatives had in
1993 "voted unanimously . . . to adjourn . . . 'in remem-
brance and honor of Jesus Christ, the Prince of Ethics'";
that the "County Judge and . . . magistrates agree with
the arguments set out by Judge [Roy] Moore" in defense of
his "display [of] the Ten Commandments in his court-
room"; and that the "Founding Father[s] [had an] explicit
understanding of the duty of elected officials to publicly
acknowledge God as the source of America's strength and
direction." Def. Exh. 1, at 1–3, 6.

As directed by the resolutions, the Counties expanded
the displays of the Ten Commandments in their locations,
presumably along with copies of the resolution, which
instructed that it, too, be posted, *id.,* at 9.  In addition to
the first display's large framed copy of the edited King
James version of the Commandments,[4] the second in-

––––––––––

[3] The First Amendment provides that "Congress shall make no law
respecting an establishment of religion, or prohibiting the free exercise
thereof . . . ."  This prohibition of establishment applies to "the States
and their political subdivisions" through the Fourteenth Amendment.
*Santa Fe Independent School Dist.* v. *Doe,* 530 U. S. 290, 301 (2000)

[4] The District Court noted that there was some confusion as to
whether the Ten Commandments hung independently in the second
display, or were incorporated into the copy of the page from the Con-
gressional Record declaring 1983 "the Year of the Bible."  96 F. Supp.
2d, at 684, and n. 4; 96 F. Supp. 2d, at 695–696, and n. 4.  The exhibits
in the record depict the Commandments hanging as a separate item,
Def. Exh. 9, and that is more consistent with the Counties' description

cluded eight other documents in smaller frames, each
either having a religious theme or excerpted to highlight a
religious element. The documents were the "endowed by
their Creator" passage from the Declaration of Independ-
ence; the Preamble to the Constitution of Kentucky; the
national motto, "In God We Trust"; a page from the Con-
gressional Record of February 2, 1983, proclaiming the
Year of the Bible and including a statement of the Ten
Commandments; a proclamation by President Abraham
Lincoln designating April 30, 1863, a National Day of
Prayer and Humiliation; an excerpt from President Lin-
coln's "Reply to Loyal Colored People of Baltimore upon
Presentation of a Bible," reading that "[t]he Bible is the
best gift God has ever given to man"; a proclamation by
President Reagan marking 1983 the Year of the Bible; and
the Mayflower Compact. 96 F. Supp. 2d, at 684; 96
F. Supp. 2d, at 695–696.

After argument, the District Court entered a prelimi-
nary injunction on May 5, 2000, ordering that the "display
. . . be removed from [each] County Courthouse
IMMEDIATELY" and that no county official "erect or
cause to be erected similar displays." 96 F. Supp. 2d, at
691; 96 F. Supp. 2d, at 702–703. The court's analysis of
the situation followed the three-part formulation first
stated in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971). As to
governmental purpose, it concluded that the original display
"lack[ed] any secular purpose" because the Commandments
"are a distinctly religious document, believed by many
Christians and Jews to be the direct and revealed word of
God." 96 F. Supp. 2d, at 686; 96 F. Supp. 2d, at 698.
Although the Counties had maintained that the original

––––––––––

of the second display in this Court. "[After erecting the first display]
Petitioners posted additional donated documents. . . . This display
consisted of the Ten Commandments along with other historical docu-
ments." Brief for Petitioners 2. Like the District Court, we find our
analysis applies equally to either format.

6     MᶜCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

display was meant to be educational, "[t]he narrow scope of the display—a single religious text unaccompanied by any interpretation explaining its role as a foundational document—can hardly be said to present meaningfully the story of this country's religious traditions."  96 F. Supp. 2d, at 686–687; 96 F. Supp. 2d, at 698.  The court found that the second version also "clearly lack[ed] a secular purpose" because the "Count[ies] narrowly tailored [their] selection of foundational documents to incorporate only those with specific references to Christianity."[5]  96 F. Supp. 2d, at 687; 96 F. Supp. 2d, at 699.

The Counties filed a notice of appeal from the preliminary injunction but voluntarily dismissed it after hiring new lawyers.  They then installed another display in each courthouse, the third within a year.  No new resolution authorized this one, nor did the Counties repeal the resolutions that preceded the second.  The posting consists of nine framed documents of equal size, one of them setting out the Ten Commandments explicitly identified as the "King James Version" at Exodus 20:3–17, 145 F. Supp. 2d 845, 847 (ED Ky. 2001) and quoted at greater length than before:

> "Thou shalt have no other gods before me.
> "Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water underneath the earth: Thou shalt not bow down thyself to them, nor serve them: for I the LORD thy God am a jealous God, visiting the iniquity of the fathers upon the children unto the third and fourth genera-

_____

[5] The court also found that the display had the effect of endorsing religion: "Removed from their historical context and placed with other documents with which the only common link is religion, the documents have the undeniable effect of endorsing religion."  96 F. Supp. 2d, at 688; 96 F. Supp. 2d, at 699–700.

tion of them that hate me.

"Thou shalt not take the name of the LORD thy God in vain: for the LORD will not hold him guiltless that taketh his name in vain.

"Remember the sabbath day, to keep it holy.

"Honour thy father and thy mother: that thy days may be long upon the land which the LORD thy God giveth thee.

"Thou shalt not kill.

"Thou shalt not commit adultery.

"Thou shalt not steal.

"Thou shalt not bear false witness against thy neighbour.

"Thou shalt not covet thy neighbour's house, thou shalt not covet th[y] neighbor's wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor anything that is th[y] neighbour's." App. to Pet. for Cert. 189a.

Assembled with the Commandments are framed copies of the Magna Carta, the Declaration of Independence, the Bill of Rights, the lyrics of the Star Spangled Banner, the Mayflower Compact, the National Motto, the Preamble to the Kentucky Constitution, and a picture of Lady Justice. The collection is entitled "The Foundations of American Law and Government Display" and each document comes with a statement about its historical and legal significance. The comment on the Ten Commandments reads:

"The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness.'

8    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

The Ten Commandments provide the moral back-
ground of the Declaration of Independence and the
foundation of our legal tradition." *Id.,* at 180a.

The ACLU moved to supplement the preliminary in-
junction to enjoin the Counties' third display,[6] and the
Counties responded with several explanations for the new
version, including desires "to demonstrate that the Ten
Commandments were part of the foundation of American
Law and Government" and "to educate the citizens of the
county regarding some of the documents that played a
significant role in the foundation of our system of law and
government." 145 F. Supp. 2d, at 848 (internal quotation
marks omitted). The court, however, took the objective of
proclaiming the Commandments' foundational value as "a
religious, rather than secular, purpose" under *Stone* v.
*Graham,* 449 U. S. 39 (1980) *(per curiam),* 145 F. Supp. 2d,
at 849, and found that the assertion that the Counties'
broader educational goals are secular "crumble[s] . . . upon
an examination of the history of this litigation," *Ibid.* In
light of the Counties' decision to post the Commandments
by themselves in the first instance, contrary to *Stone*, and
later to "accentuat[e]" the religious objective by surround-
ing the Commandments with "specific references to Chris-
tianity," the District Court understood the Counties'
"clear" purpose as being to post the Commandments, not
to educate.[7] 145 F. Supp. 2d, at 849–850 (internal quota-
tion marks omitted).

———————

[6] Before the District Court issued the modified injunction, the Coun-
ties removed the label of "King James Version" and the citation to
Exodus. 145 F. Supp. 2d 845, 847 (ED Ky. 2001).

[7] The Court also found that the effect of the third display was to en-
dorse religion because the "reasonable observer will see one religious
code placed alongside eight political or patriotic documents, and will
understand that the counties promote that one religious code as being
on a par with our nation's most cherished secular symbols and docu-
ments" and because the "reasonable observer [would know] something

As requested, the trial court supplemented the injunction, and a divided panel of the Court of Appeals for the Sixth Circuit affirmed. The Circuit majority stressed that under *Stone*, displaying the Commandments bespeaks a religious object unless they are integrated with other material so as to carry "a secular message," 354 F. 3d 438, 449 (2003). The majority judges saw no integration here because of a "lack of a demonstrated analytical or historical connection [between the Commandments and] the other documents." *Id.,* at 451. They noted in particular that the Counties offered no support for their claim that the Ten Commandments "provide[d] the moral backdrop" to the Declaration of Independence or otherwise "profoundly influenced" it. *Ibid.* (Internal quotation marks omitted). The majority found that the Counties' purpose was religious, not educational, given the nature of the Commandments as "an active symbol of religion [stating] 'the religious duties of believers,'" *Id.,* at 455. The judges in the majority understood the identical displays to emphasize "a single religious influence, with no mention of any other religious or secular influences," *id.,* at 454, and they took the very history of the litigation as evidence of the Counties' religious objective, *id.,* at 457.

Judge Ryan dissented on the basis of wide recognition that religion, and the Ten Commandments in particular, have played a foundational part in the evolution of American law and government; he saw no reason to gainsay the Counties' claim of secular purposes. *Id.,* at 472–473. The dissent denied that the prior displays should have any bearing on the constitutionality of the current one: a "history of unconstitutional displays can[not] be used as a

_____

of the controversy surrounding these displays, which has focused on only one of the nine framed documents: the Ten Commandments." *Id.*, at 851, 852.

10 MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

sword to strike down an otherwise constitutional display."[8]
*Id.,* at 478.

We granted certiorari, 543 U. S. ___ (2004), and now
affirm.

## II

Twenty-five years ago in a case prompted by posting the
Ten Commandments in Kentucky's public schools, this
Court recognized that the Commandments "are undenia-
bly a sacred text in the Jewish and Christian faiths" and
held that their display in public classrooms violated the
First Amendment's bar against establishment of religion.
*Stone,* 449 U. S., at 41. *Stone* found a predominantly reli-
gious purpose in the government's posting of the Com-
mandments, given their prominence as "'an instrument of
religion,'" *id.,* at 41, n. 3 (quoting *School Dist. of Abington
Township* v. *Schempp,* 374 U. S. 203, 224 (1963)). The
Counties ask for a different approach here by arguing that
official purpose is unknowable and the search for it inher-
ently vain. In the alternative, the Counties would avoid
the District Court's conclusion by having us limit the scope
of the purpose enquiry so severely that any trivial ration-
alization would suffice, under a standard oblivious to the
history of religious government action like the progression
of exhibits in this case.

------

[8]The Sixth Circuit did not decide whether the display had the im-
permissible effect of advancing religion because one judge, having found
the display motivated by a religious purpose, did not reach that issue.
354 F. 3d, at 462 (Gibbons, J., concurring). The other judge in the
majority concluded that a reasonable observer would find that the
display had the effect of endorsing religion given the lack of analytical
connection between the Commandments and the other documents in
the display, the courthouse location of the display, and the history of
the displays. *Id.,* at 458–459. The dissent found no effect of endorse-
ment because it concluded that a reasonable observer would only see
that the County had merely acknowledged the foundational role of the
Ten Commandments rather than endorsed their religious content. *Id.,*
at 479–480.

Opinion of the Court

### A

Ever since *Lemon* v. *Kurtzman* summarized the three familiar considerations for evaluating Establishment Clause claims, looking to whether government action has "a secular legislative purpose" has been a common, albeit seldom dispositive, element of our cases. 403 U. S., at 612. Though we have found government action motivated by an illegitimate purpose only four times since *Lemon*,[9] and "the secular purpose requirement alone may rarely be determinative . . . , it nevertheless serves an important function."[10] *Wallace* v. *Jaffree,* 472 U. S. 38, 75 (1985) (O'CONNOR, J., concurring in judgment).

The touchstone for our analysis is the principle that the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson* v. *Arkansas,* 393 U. S. 97, 104 (1968); *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 15–16 (1947); *Wallace* v. *Jaffree, supra*, at 53. When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides. *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327, 335 (1987) ("*Lemon*'s 'purpose' requirement aims at preventing [government] from abandoning neutrality and

─────────

[9] *Stone* v. *Graham*, 449 U. S. 39, 41 (1980) *(per curiam); Wallace* v. *Jaffree*, 472 U. S. 38, 56–61 (1985); *Edwards* v. *Aguillard*, 482 U. S. 578, 586–593 (1987); *Santa Fe Independent School District* v. *Doe*, 530 U. S., at 308–309.

[10] At least since *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1 (1947), it has been clear that Establishment Clause doctrine lacks the comfort of categorical absolutes. In special instances we have found good reason to hold governmental action legitimate even where its manifest purpose was presumably religious. See, *e.g.*, *Marsh* v. *Chambers,* 463 U. S. 783 (1983) (upholding legislative prayer despite its religious nature). No such reasons present themselves here.

12    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

acting with the intent of promoting a particular point of view in religious matters"). Manifesting a purpose to favor one faith over another, or adherence to religion generally, clashes with the "understanding, reached . . . after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens . . . ." *Zelman* v. *Simmons-Harris,* 536 U. S. 639, 718 (2002) (BREYER, J., dissenting). By showing a purpose to favor religion, the government "sends the . . . message to . . . nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members. . . .'" *Santa Fe Independent School Dist.* v. *Doe,* 530 U. S. 290, 309–310 (2000) (quoting *Lynch* v. *Donnelly,* 465 U. S. 668, 688 (1984) (O'CONNOR, J., concurring)).

Indeed, the purpose apparent from government action can have an impact more significant than the result expressly decreed: when the government maintains Sunday closing laws, it advances religion only minimally because many working people would take the day as one of rest regardless, but if the government justified its decision with a stated desire for all Americans to honor Christ, the divisive thrust of the official action would be inescapable. This is the teaching of *McGowan* v. *Maryland,* 366 U. S. 420 (1961), which upheld Sunday closing statutes on practical, secular grounds after finding that the government had forsaken the religious purposes behind centuries-old predecessor laws. *Id.,* at 449–451.

B

Despite the intuitive importance of official purpose to the realization of Establishment Clause values, the Counties ask us to abandon *Lemon*'s purpose test, or at least to truncate any enquiry into purpose here. Their first argument is that the very consideration of purpose is decep-

tive: according to them, true "purpose" is unknowable, and its search merely an excuse for courts to act selectively and unpredictably in picking out evidence of subjective intent. The assertions are as seismic as they are unconvincing.

Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country, *e.g., General Dynamics Land Systems, Inc.* v. *Cline,* 540 U. S. 581, 600 (2004) (interpreting statute in light of its "text, structure, purpose, and history"), and governmental purpose is a key element of a good deal of constitutional doctrine, *e.g.*, *Washington* v. *Davis,* 426 U. S. 229 (1976) (discriminatory purpose required for Equal Protection violation); *Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U. S. 333, 352–353 (1977) (discriminatory purpose relevant to dormant Commerce Clause claim); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520 (1993) (discriminatory purpose raises level of scrutiny required by free exercise claim). With enquiries into purpose this common, if they were nothing but hunts for mares' nests deflecting attention from bare judicial will, the whole notion of purpose in law would have dropped into disrepute long ago.

But scrutinizing purpose does make practical sense, as in Establishment Clause analysis, where an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts. *Wallace* v. *Jaffree, supra,* at 74 (O'CONNOR, J., concurring in judgment). The eyes that look to purpose belong to an "'objective observer,'" one who takes account of the traditional external signs that show up in the "'text, legislative history, and implementation of the statute,'" or comparable official act. *Santa Fe Independent School Dist.* v. *Doe, supra,* at 308 (quoting *Wallace* v. *Jaffree*, 472 U. S., at 73) (O'CONNOR, J., concurring in judgment)); see also *Edwards* v. *Aguillard,* 482 U. S. 578,

14    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

594–595 (1987) (enquiry looks to "plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history [and] the historical context of the statute, . . . and the specific sequence of events leading to [its] passage"). There is, then, nothing hinting at an unpredictable or disingenuous exercise when a court enquires into purpose after a claim is raised under the Establishment Clause.

The cases with findings of a predominantly religious purpose point to the straightforward nature of the test. In *Wallace*, for example, we inferred purpose from a change of wording from an earlier statute to a later one, each dealing with prayer in schools. 472 U. S., at 58–60. And in *Edwards*, we relied on a statute's text and the detailed public comments of its sponsor, when we sought the purpose of a state law requiring creationism to be taught alongside evolution. 482 U. S., at 586–588. In other cases, the government action itself bespoke the purpose, as in *Abington*, where the object of required Bible study in public schools was patently religious, 374 U. S., at 223–224; in *Stone*, the Court held that the "[p]osting of religious texts on the wall serve[d] no . . . educational function," and found that if "the posted copies of the Ten Commandments [were] to have any effect at all, it [would] be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." 449 U. S., at 42. In each case, the government's action was held unconstitutional only because openly available data supported a commonsense conclusion that a religious objective permeated the government's action.

Nor is there any indication that the enquiry is rigged in practice to finding a religious purpose dominant every time a case is filed. In the past, the test has not been fatal very often, presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing religion. That said, one consequence

of the corollary that Establishment Clause analysis does not look to the veiled psyche of government officers could be that in some of the cases in which establishment complaints failed, savvy officials had disguised their religious intent so cleverly that the objective observer just missed it. But that is no reason for great constitutional concern. If someone in the government hides religious motive so well that the "'objective observer, acquainted with the text, legislative history, and implementation of the statute,'" *Santa Fe Independent School Dist.* v. *Doe,* 530 U. S., at 308 (quoting *Wallace, supra*, at 73) (O'CONNOR, J., concurring in judgment)), cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to taking religious sides. A secret motive stirs up no strife and does nothing to make outsiders of nonadherents, and it suffices to wait and see whether such government action turns out to have (as it may even be likely to have) the illegitimate effect of advancing religion.

C

After declining the invitation to abandon concern with purpose wholesale, we also have to avoid the Counties' alternative tack of trivializing the enquiry into it. The Counties would read the cases as if the purpose enquiry were so naive that any transparent claim to secularity would satisfy it, and they would cut context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances. There is no precedent for the Counties' arguments, or reason supporting them.

1

*Lemon* said that government action must have "a secular . . . purpose," 403 U. S., at 612, and after a host of cases it is fair to add that although a legislature's stated

16    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective.  See, *e.g., Santa Fe Independent School Dist.* v. *Doe, supra,* at 308 ("When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference.  But it is nonetheless the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one'"); *Edwards,* 482 U. S., at 586–587 ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham"); *id.,* at 590, 594 (referring to enquiry as one into "preeminent" or "primary" purpose); *Stone, supra*, at 41 (looking to the "pre-eminent purpose" of government action).

Even the Counties' own cited authority confirms that we have not made the purpose test a pushover for any secular claim.  True, *Wallace* said government action is tainted by its object "if it is entirely motivated by a purpose to advance religion," 472 U. S., at 56, a remark that suggests, in isolation, a fairly complaisant attitude.  But in that very case the Court declined to credit Alabama's stated secular rationale of "accommodation" for legislation authorizing a period of silence in school for meditation or voluntary prayer, given the implausibility of that explanation in light of another statute already accommodating children wishing to pray.  *Id.,* at 57, n. 45 (internal quotation marks omitted).  And it would be just as much a mistake to infer that a timid standard underlies the statement in *Lynch* v. *Donnelly* that the purpose enquiry looks to whether government "activity was motivated wholly by religious considerations," 465 U. S., at 680; for two cases cited for that proposition had examined and rejected claims of secular purposes that turned out to be implausi-

ble or inadequate:[11] *Stone,* 449 U. S., at 41; *Abington,* 374 U. S., at 223–224.[12]  See also *Bowen* v. *Kendrick,* 487 U. S. 589, 602 (1988) (using the "motivated wholly by an impermissible purpose" language, but citing *Lynch* and *Stone*).  As we said, the Court often does accept governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims.  But in those unusual cases where the claim was an apparent sham, or the secular purpose secondary, the unsurprising results have been findings of no adequate secular object, as against a predominantly religious one.[13]

## 2

The Counties' second proffered limitation can be dispatched quickly.  They argue that purpose in a case like

---

[11] Moreover, JUSTICE O'CONNOR provided the fifth vote for the *Lynch* majority and her concurrence emphasized the point made implicitly in the majority opinion that a secular purpose must be serious to be sufficient.  465 U. S., at 691 (The purpose inquiry "is not satisfied . . . by the mere existence of some secular purpose, however dominated by religious purposes").

[12] *Stone* found the sacred character of the Ten Commandments pre-eminent despite an avowed secular purpose to show their "adoption as the fundamental legal code of Western Civilization and the Common Law . . . ."  449 U. S., at 39–40, n. 1 (internal quotation marks omitted). And the *Abington* Court was unconvinced that music education or the teaching of literature were actual secular objects behind laws requiring public school teachers to lead recitations from the Lord's Prayer and readings from the Bible.  374 U. S., at 273.

[13] The dissent nonetheless maintains that the purpose test is satisfied so long as any secular purpose for the government action is apparent. *Post*, at 18–19 (opinion of SCALIA, J.).  Leaving aside the fact that this position is inconsistent with the language of the cases just discussed, it would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action.  While heightened deference to legislatures is appropriate for the review of economic legislation, an approach that credits any valid purpose, no matter how trivial, has not been the way the Court has approached government action that implicates establishment.

18    MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

this one should be inferred, if at all, only from the latest news about the last in a series of governmental actions, however close they may all be in time and subject. But the world is not made brand new every morning, and the Counties are simply asking us to ignore perfectly probative evidence; they want an absentminded objective observer, not one presumed to be familiar with the history of the government's actions and competent to learn what history has to show, *Santa Fe Independent School Dist.* v. *Doe,* 530 U. S., at 308 (objective observer is familiar with "'implementation of'" government action) (quoting *Wallace, supra,* at 73) (O'CONNOR, J., concurring in judgment)); *Edwards, supra,* at 595 (enquiry looks to "the historical context of the statute . . . and the specific sequence of events leading to [its] passage"); *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753, 780 (1995) (O'CONNOR, J., concurring in part and concurring in judgment) ("[T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears"). The Counties' position just bucks common sense: reasonable observers have reasonable memories, and our precedents sensibly forbid an observer "to turn a blind eye to the context in which [the] policy arose."[14]

---

[14] One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage. This presents no incongruity, however, because purpose matters. Just as Holmes's dog could tell the difference between being kicked and being stumbled over, it will matter to objective observers whether posting the Commandments follows on the heels of displays motivated by sectarianism, or whether it lacks a history demonstrating that purpose. The dissent, apparently not giving the reasonable observer as much credit as Holmes's dog, contends that in practice it will be "absur[d]" to rely upon differences in purpose in assessing government action. *Post,* at 24. As an initial matter, it will be the rare case in which one of two identical displays violates the purpose prong.

*Santa Fe Independent School Dist.* v. *Doe, supra*, at 315.

## III

This case comes to us on appeal from a preliminary injunction. We accordingly review the District Court's legal rulings *de novo*, and its ultimate conclusion for abuse of discretion.[15] *Ashcroft* v. *American Civil Liberties Union,* 542 U. S. 656 (2004).

We take *Stone* as the initial legal benchmark, our only case dealing with the constitutionality of displaying the Commandments. *Stone* recognized that the Commandments are an "instrument of religion" and that, at least on the facts before it, the display of their text could presumptively be understood as meant to advance religion: although state law specifically required their posting in public school classrooms, their isolated exhibition did not leave room even for an argument that secular education explained their being there. 449 U. S., at 41, n. 3 (internal quotation marks omitted). But *Stone* did not purport to decide the constitutionality of every possible way the Commandments might be set out by the government, and under the Establishment Clause detail is key. *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 595 (1989) (opinion of

---

In general, like displays tend to show like objectives and will be treated accordingly. But where one display has a history manifesting sectarian purpose that the other lacks, it is appropriate that they be treated differently, for the one display will be properly understood as demonstrating a preference for one group of religious believers as against another. See *supra*, at 11–12. While posting the Commandments may not have the effect of causing greater adherence to them, an ostensible indication of a purpose to promote a particular faith certainly will have the effect of causing viewers to understand the government is taking sides.

[15] We note that the only factor in the preliminary injunction analysis that is at issue here is the likelihood of the ACLU's success on the merits.

20    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

Blackmun, J.) ("[T]he question is what viewers may fairly understand to be the purpose of the display. That inquiry, of necessity, turns upon the context in which the contested object appears") (internal quotation marks and citation omitted). Hence, we look to the record of evidence showing the progression leading up to the third display of the Commandments.

## A

The display rejected in *Stone* had two obvious similarities to the first one in the sequence here: both set out a text of the Commandments as distinct from any traditionally symbolic representation, and each stood alone, not part of an arguably secular display. *Stone* stressed the significance of integrating the Commandments into a secular scheme to forestall the broadcast of an otherwise clearly religious message, *supra*, at 42, and for good reason, the Commandments being a central point of reference in the religious and moral history of Jews and Christians. They proclaim the existence of a monotheistic god (no other gods). They regulate details of religious obligation (no graven images, no sabbath breaking, no vain oath swearing). And they unmistakably rest even the universally accepted prohibitions (as against murder, theft, and the like) on the sanction of the divinity proclaimed at the beginning of the text. Displaying that text is thus different from a symbolic depiction, like tablets with 10 roman numerals, which could be seen as alluding to a general notion of law, not a sectarian conception of faith. Where the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting a message going beyond an excuse to promote the religious point of view. The display in *Stone* had no context that might have indicated an object beyond the religious character of the text, and the Counties' solo exhibit here did nothing more to counter the sectarian implication

than the postings at issue in *Stone*.[16]  See also *County of Allegheny, supra*, at 598 ("Here, unlike in *Lynch* [v. *Donnelly*], nothing in the context of the display detracts from the crèche's religious message").  Actually, the posting by the Counties lacked even the *Stone* display's implausible disclaimer that the Commandments were set out to show their effect on the civil law.[17]  What is more, at the ceremony for posting the framed Commandments in Pulaski County, the county executive was accompanied by his pastor, who testified to the certainty of the existence of God.  The reasonable observer could only think that the Counties meant to emphasize and celebrate the Commandments' religious message.

This is not to deny that the Commandments have had influence on civil or secular law; a major text of a majority religion is bound to be felt.  The point is simply that the original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction.  When the government initiates an effort to place this statement alone in public view, a religious object is unmistakable.

B

Once the Counties were sued, they modified the exhibits and invited additional insight into their purpose in a display that hung for about six months.  This new one was the product of forthright and nearly identical Pulaski and McCreary County resolutions listing a series of American

---

[16] Although the Counties point out that the courthouses contained other displays besides the Ten Commandments, there is no suggestion that the Commandments display was integrated to form a secular display.

[17] In *Stone*, the Commandments were accompanied by a small disclaimer: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States."  449 U. S., at 39–40, n. 1 (internal quotation marks omitted).

22    MᶜCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

historical documents with theistic and Christian references, which were to be posted in order to furnish a setting for displaying the Ten Commandments and any "other Kentucky and American historical documen[t]" without raising concern about "any Christian or religious references" in them. Def. Exh. 1, at 1. As mentioned, the resolutions expressed support for an Alabama judge who posted the Commandments in his courtroom, and cited the fact the Kentucky Legislature once adjourned a session in honor of "Jesus Christ, Prince of Ethics." *Id.,* at 2–3.

In this second display, unlike the first, the Commandments were not hung in isolation, merely leaving the Counties' purpose to emerge from the pervasively religious text of the Commandments themselves. Instead, the second version was required to include the statement of the government's purpose expressly set out in the county resolutions, and underscored it by juxtaposing the Commandments to other documents with highlighted references to God as their sole common element. The display's unstinting focus was on religious passages, showing that the Counties were posting the Commandments precisely because of their sectarian content. That demonstration of the government's objective was enhanced by serial religious references and the accompanying resolution's claim about the embodiment of ethics in Christ. Together, the display and resolution presented an indisputable, and undisputed, showing of an impermissible purpose.

Today, the Counties make no attempt to defend their undeniable objective, but instead hopefully describe version two as "dead and buried." Reply Brief for Petitioners 15. Their refusal to defend the second display is understandable, but the reasonable observer could not forget it.

## C

### 1

After the Counties changed lawyers, they mounted a

third display, without a new resolution or repeal of the old one. The result was the "Foundations of American Law and Government" exhibit, which placed the Commandments in the company of other documents the Counties thought especially significant in the historical foundation of American government. In trying to persuade the District Court to lift the preliminary injunction, the Counties cited several new purposes for the third version, including a desire "to educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government."[18] 145 F. Supp. 2d, at 848 (internal quotation marks omitted). The Counties' claims did not, however, persuade the court, intimately familiar with the details of this litigation, or the Court of Appeals, neither of which found a legitimizing secular purpose in this third version of the display. "'When both courts [that have already passed on the case] are unable to discern an arguably valid secular purpose, this Court normally should hesitate to find one.'" *Edwards,* 482 U. S., at 594, n. 15 (quoting *Wallace,* 472 U. S., at 66 (Powell, J., concurring)). The conclusions of the two courts preceding us in this case are well warranted.

These new statements of purpose were presented only as a litigating position, there being no further authorizing action by the Counties' governing boards. And although repeal of the earlier county authorizations would not have erased them from the record of evidence bearing on cur-

———————

[18] The Counties' other purposes were:

"to erect a display containing the Ten Commandments that is constitutional; . . . to demonstrate that the Ten Commandments were part of the foundation of American Law and Government; . . . [to include the Ten Commandments] as part of the display for their significance in providing 'the moral background of the Declaration of Independence and the foundation of our legal tradition.'" 145 F. Supp. 2d, at 848 (some internal quotation marks omitted).

24    MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

rent purpose,[19] the extraordinary resolutions for the second display passed just months earlier were not repealed or otherwise repudiated.[20]  Indeed, the sectarian spirit of the common resolution found enhanced expression in the third display, which quoted more of the purely religious language of the Commandments than the first two displays had done; for additions, see App. to Pet. for Cert. 189a ("I the LORD thy God am a jealous God") (text of Second Commandment in third display); ("the LORD will not hold him guiltless that taketh his name in vain") (from text of Third Commandment); and ("that thy days may be long upon the land which the LORD thy God giveth thee") (text of Fifth Commandment).  No reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays.

Nor did the selection of posted material suggest a clear theme that might prevail over evidence of the continuing religious object.  In a collection of documents said to be "foundational" to American government, it is at least odd to include a patriotic anthem, but to omit the Fourteenth Amendment, the most significant structural provision

––––––––––

[19] Following argument in this case, in which the resolutions were discussed, the McCreary and Pulaski County Boards did repeal the resolutions, acts of obviously minimal significance in the evolution of the evidence.

[20] The Counties argue that the objective observer would not continue to believe that the resolution was in effect after the third display went up because the resolution authorized only the second display.  But the resolution on its face is not limited to any particular display.  On the contrary, it encourages the creation of a display with the Ten Commandments that also includes such documents as "the National anthem . . . the National Motto . . . the preamble to the Kentucky Constitution[,] the Declaration of Independence [and] the Mayflower Compact . . . without censorship because of any Christian or religious references."  Def. Exh. 1, at 1.  The third display contains all of these documents, suggesting that it fell within the resolutions as well.  The record does not indicate whether the resolutions were posted with the third display.

adopted since the original Framing. And it is no less baffling to leave out the original Constitution of 1787 while quoting the 1215 Magna Carta even to the point of its declaration that "fish-weirs shall be removed from the Thames." App. to Pet. for Cert. 205a, ¶33. If an observer found these choices and omissions perplexing in isolation, he would be puzzled for a different reason when he read the Declaration of Independence seeking confirmation for the Counties' posted explanation that the "Ten Commandments' . . . influence is clearly seen in the Declaration," *id.,* at 180a; in fact the observer would find that the Commandments are sanctioned as divine imperatives, while the Declaration of Independence holds that the authority of government to enforce the law derives "from the consent of the governed," *id.,* at 190a.[21] If the observer had not thrown up his hands, he would probably suspect that the Counties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality.[22]

―――――――

[21] The Counties have now backed away from their broad assertion that the Commandments provide "the" moral background of the Declaration of Independence, and now merely claim that many of the Commandments "regarding murder, property, theft, coveting, marriage, rest from labor and honoring parents are compatible with the rights to life, liberty and happiness." Brief for Petitioners 10, n. 7.

[22] The Counties grasp at *McGowan* v. *Maryland,* 366 U. S. 420 (1961), but it bears little resemblance to this case. As noted *supra,* at 12–13, *McGowan* held that religious purposes behind centuries-old predecessors of Maryland's Sunday laws were not dispositive of the purposes of modern Sunday laws, where the legislature had removed much of the religious reference in the laws and stated secular and pragmatic justifications for them. 366 U. S., at 446–452. But a conclusion that centuries-old purposes may no longer be operative says nothing about the relevance of recent evidence of purpose, and this case is far more like *Santa Fe,* with its evolution of a school football game prayer policy over the course of a single lawsuit. Like that case, "[t]his [one] comes to us as the latest step in developing litigation brought as a challenge to institutional practices that unquestionably violated the Establishment

2

In holding the preliminary injunction adequately supported by evidence that the Counties' purpose had not changed at the third stage, we do not decide that the Counties' past actions forever taint any effort on their part to deal with the subject matter.  We hold only that purpose needs to be taken seriously under the Establishment Clause and needs to be understood in light of context; an implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense.  It is enough to say here that district courts are fully capable of adjusting preliminary relief to take account of genuine changes in constitutionally significant conditions.  See *Ashcroft* v. *American Civil Liberties Union,* 542 U. S. 656 (2004).

Nor do we have occasion here to hold that a sacred text can never be integrated constitutionally into a governmental display on the subject of law, or American history.  We do not forget, and in this litigation have frequently been reminded, that our own courtroom frieze was deliberately designed in the exercise of governmental authority so as to include the figure of Moses holding tablets exhibiting a portion of the Hebrew text of the later, secularly phrased Commandments; in the company of 17 other lawgivers, most of them secular figures, there is no risk that Moses would strike an observer as evidence that the National Government was violating neutrality in religion.[23]

_____

Clause."    530 U. S., at 315. (describing the evolution of the school district's football prayer policy).  Thus, as in *Santa Fe,* it makes sense to examine the Counties' latest action "in light of [their] history of" unconstitutional practices.  *Id.,* at 309.

[23]The dissent notes that another depiction of Moses and the Commandments adorns this Court's east pediment.  *Post*, at 23.  But as with the courtroom frieze, Moses is found in the company of other figures, not only great but secular.

IV

The importance of neutrality as an interpretive guide is no less true now than it was when the Court broached the principle in *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1 (1947), and a word needs to be said about the different view taken in today's dissent. We all agree, of course, on the need for some interpretative help. The First Amendment contains no textual definition of "establishment," and the term is certainly not self-defining. No one contends that the prohibition of establishment stops at a designation of a national (or with Fourteenth Amendment incorporation, *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940), a state) church, but nothing in the text says just how much more it covers. There is no simple answer, for more than one reason.

The prohibition on establishment covers a variety of issues from prayer in widely varying government settings, to financial aid for religious individuals and institutions, to comment on religious questions. In these varied settings, issues of about interpreting inexact Establishment Clause language, like difficult interpretative issues generally, arise from the tension of competing values, each constitutionally respectable, but none open to realization to the logical limit.

The First Amendment has not one but two clauses tied to "religion," the second forbidding any prohibition on the "the free exercise thereof," and sometimes, the two clauses compete: spending government money on the clergy looks like establishing religion, but if the government cannot pay for military chaplains a good many soldiers and sailors would be kept from the opportunity to exercise their chosen religions. See *Cutter* v. *Wilkinson*, 544 U. S. ___, ___ (2005) (slip. op., at 8–9). At other times, limits on governmental action that might make sense as a way to avoid establishment could arguably limit freedom of speech when the speaking is done under government

28    MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

auspices. *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819 (1995). The dissent, then, is wrong to read cases like *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664 (1970), as a rejection of neutrality on its own terms, *post,* at 7–8, for trade-offs are inevitable, and an elegant interpretative rule to draw the line in all the multifarious situations is not be had.

Given the variety of interpretative problems, the principle of neutrality has provided a good sense of direction: the government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals under the Free Exercise Clause. The principle has been helpful simply because it responds to one of the major concerns that prompted adoption of the Religion Clauses. The Framers and the citizens of their time intended not only to protect the integrity of individual conscience in religious matters, *Wallace* v. *Jaffree,* 472 U. S., at 52–54, and n. 38, but to guard against the civic divisiveness that follows when the Government weighs in on one side of religious debate; nothing does a better job of roiling society, a point that needed no explanation to the descendants of English Puritans and Cavaliers (or Massachusetts Puritans and Baptists). *E.g.,* *Everson, supra,* at 8 ("A large proportion of the early settlers of this country came here from Europe to escape [religious persecution]"). A sense of the past thus points to governmental neutrality as an objective of the Establishment Clause, and a sensible standard for applying it. To be sure, given its generality as a principle, an appeal to neutrality alone cannot possibly lay every issue to rest, or tell us what issues on the margins are substantial enough for constitutional significance, a point that has been clear from the Founding era to modern times. *E.g.,* Letter from J. Madison to R. Adams (1832), in 5 The Founders' Constitution at 107 (P. Kurland & R. Lerner eds. 1987) ("[In calling for separation] I must admit moreover that it may not be easy, in

every possible case, to trace the line of separation between the rights of religion and the Civil authority with such distinctness as to avoid collisions & doubts on unessential points"); *Sherbert* v. *Verner*, 374 U. S. 398, 422 (1963) (Harlan, J., dissenting) ("The constitutional obligation of 'neutrality' . . . is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation"). But invoking neutrality is a prudent way of keeping sight of something the Framers of the First Amendment thought important.

The dissent, however, puts forward a limitation on the application of the neutrality principle, with citations to historical evidence said to show that the Framers understood the ban on establishment of religion as sufficiently narrow to allow the government to espouse submission to the divine will. The dissent identifies God as the God of monotheism, all of whose three principal strains (Jewish, Christian, and Muslim) acknowledge the religious importance of the Ten Commandments. *Post*, at 9–10. On the dissent's view, it apparently follows that even rigorous espousal of a common element of this common monotheism, is consistent with the establishment ban.

But the dissent's argument for the original understanding is flawed from the outset by its failure to consider the full range of evidence showing what the Framers believed. The dissent is certainly correct in putting forward evidence that some of the Framers thought some endorsement of religion was compatible with the establishment ban; the dissent quotes the first President as stating that "national morality [cannot] prevail in exclusion of religious principle," for example, *post*, at 3, and it cites his first Thanksgiving proclamation giving thanks to God, *post*, at 2 (internal quotation marks omitted). Surely if expressions like these from Washington and his contemporaries were all we had to go on, there would be a good case that the neutrality principle has the effect of broadening the

30    MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

ban on establishment beyond the Framers' understanding of it (although there would, of course, still be the question of whether the historical case could overcome some 60 years of precedent taking neutrality as its guiding principle).[24]

But the fact is that we do have more to go on, for there is also evidence supporting the proposition that the Framers intended the Establishment Clause to require governmental neutrality in matters of religion, including neutrality in statements acknowledging religion. The very language of the Establishment Clause represented a significant departure from early drafts that merely prohibited a single national religion, and, the final language instead "extended [the] prohibition to state support for 'religion' in general." See *Lee* v. *Weisman,* 505 U. S. 577, 614–615 (1992) (SOUTER, J., concurring) (tracing development of language).

The historical record, moreover, is complicated beyond the dissent's account by the writings and practices of figures no less influential than Thomas Jefferson and James Madison. Jefferson, for example, refused to issue Thanksgiving Proclamations because he believed that they violated the Constitution. See Letter to S. Miller (Jan. 23, 1808), in 5 The Founders' Constitution at 98. And Madison, whom the dissent claims as supporting its thesis,

---

[24] The dissent also maintains that our precedents show that a solo display of the Commandments is a mere acknowledgement of religion "on par with the inclusion of a crèche or a menorah" in a holiday display, or an official's speech or prayer, *post*, at 22. Whether or not our views would differ about the significance of those practices if we were considering them as original matters, they manifest no objective of subjecting individual lives to religious influence comparable to the apparent and openly acknowledged purpose behind posting the Commandments. Crèches placed with holiday symbols and prayers by legislators do not insistently call for religious action on the part of citizens; the history of posting the Commandments expressed a purpose to urge citizens to act in prescribed ways as a personal response to divine authority.

*post*, at 4, criticized Virginia's general assessment tax not just because it required people to donate "three pence" to religion, but because "it is itself a signal of persecution. It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority." 505 U. S., at 622 (internal quotation marks omitted); see also Letter from J. Madison to E. Livingston (July 10, 1822), in 5 The Founders' Constitution, at 106 ("[R]eligion & Govt. will both exist in greater purity, the less they are mixed together"); Letter from J. Madison to J. Adams (Sept. 1833) in Religion and Politics in the Early Republic 120 (D. Dresibach ed. 1996) (stating that with respect to religion and government the "tendency to a usurpation on one side, or the other, or to a corrupting coalition or alliance between them, will be best guarded against by an entire abstinence of the Government from interference"); *Van Orden* v. *Perry*, 545 U. S. ___ (2005) (STEVENS, J., dissenting) (slip op., at 19-20).[25]

The fair inference is that there was no common understanding about the limits of the establishment prohibition, and the dissent's conclusion that its narrower view was the original understanding, *post*, at 2–3, stretches the evidence beyond tensile capacity. What the evidence does show is a group of statesmen, like others before and after them, who proposed a guarantee with contours not wholly worked out, leaving the Establishment Clause with edges still to be determined. And none the worse for that. Indeterminate edges are the kind to have in a constitution

_____

[25] The dissent cites material suggesting that separationists like Jefferson and Madison were not absolutely consistent in abstaining from official religious acknowledgment. *Post*, at 4. But, a record of inconsistent historical practice is too weak a lever to upset decades of precedent adhering to the neutrality principle. And it is worth noting that Jefferson thought his actions were consistent with non-endorsement of religion and Madison regretted any backsliding he may have done. *Lee* v. *Weisman*, 505 U. S. 577, 622–25 (1992) (SOUTER, J., concurring). "Homer nodded." *Id.,* at 624, n. 5 (corrected in erratum at 535 U. S., at II).

32    MᴄCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

meant to endure, and to meet "exigencies which, if fore-
seen at all, must have been seen dimly, and which can be
best provided for as they occur." *McCulloch* v. *Maryland,*
4 Wheat. 316, 415 (1819).

While the dissent fails to show a consistent original
understanding from which to argue that the neutrality
principle should be rejected, it does manage to deliver a
surprise. As mentioned, the dissent says that the deity
the Framers had in mind was the God of monotheism,
with the consequence that government may espouse a
tenet of traditional monotheism. This is truly a remark-
able view. Other members of the Court have dissented on
the ground that the Establishment Clause bars nothing
more than governmental preference for one religion over
another, *e.g., Wallace* v. *Jaffree,* 472 U. S., at 98–99
(REHNQUIST, J., dissenting), but at least religion has
previously been treated inclusively. Today's dissent,
however, apparently means that government should be
free to approve the core beliefs of a favored religion over
the tenets of others, a view that should trouble anyone
who prizes religious liberty. Certainly history cannot
justify it; on the contrary, history shows that the religion
of concern to the Framers was not that of the monotheistic
faiths generally, but Christianity in particular, a fact that
no member of this Court takes as a premise for construing
the Religion Clauses. Justice Story probably reflected the
thinking of the framing generation when he wrote in his
Commentaries that the purpose of the Clause was "not to
countenance, much less to advance, Mahometanism, or
Judaism, or infidelity, by prostrating Christianity; but to
exclude all rivalry among Christian sects." R. Cord, Sepa-
ration of Church and State: Historical Fact and Current
Fiction 13 (1988) (emphasis omitted). The Framers would,
therefore, almost certainly object to the dissent's unstated
reasoning that because Christianity was a monotheistic
"religion," monotheism with Mosaic antecedents should be

a touchstone of establishment interpretation.[26] Even on originalist critiques of existing precedent there is, it seems, no escape from interpretative consequences that would surprise the Framers. Thus, it appears to be common ground in the interpretation of a Constitution "intended to endure for ages to come," *McCulloch* v. *Maryland, supra*, at 415, that applications unanticipated by the Framers are inevitable.

Historical evidence thus supports no solid argument for changing course (whatever force the argument might have when directed at the existing precedent), whereas public discourse at the present time certainly raises no doubt about the value of the interpretative approach invoked for 60 years now. We are centuries away from the St. Bartholomew's Day massacre and the treatment of heretics in early Massachusetts, but the divisiveness of religion in current public life is inescapable. This is no time to deny the prudence of understanding the Establishment Clause to require the Government to stay neutral on religious belief, which is reserved for the conscience of the individual.

V

Given the ample support for the District Court's finding

---

[26] There might, indeed, even have been some reservations about monotheism as the paradigm example. It is worth noting that the canonical biography of George Washington, the dissent's primary exemplar of the monotheistic tradition, calls him a deist. J. Flexner, George Washington: Anguish and Farewell (1793–1799) 490 (1972) ("Washington's religious belief was that of the enlightenment: deism"). It would have been odd for the First Congress to propose an Amendment with Religion Clauses that took no account of the President's religion. As with other historical matters pertinent here, however, there are conflicting conclusions. R. Brookhiser, Founding Father: Rediscovering George Washington 146 (1996) ("Washington's God was no watchmaker"). History writ small does not give clear and certain answers to questions about the limits of "religion" or "establishment."

34    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Opinion of the Court

of a predominantly religious purpose behind the Counties' third display, we affirm the Sixth Circuit in upholding the preliminary injunction.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 03–1693

MᴄCREARY COUNTY, KENTUCKY, ᴇᴛ ᴀʟ., PETI-
TIONERS *v.* AMERICAN CIVIL LIBERTIES
UNION OF KENTUCKY ᴇᴛ ᴀʟ.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 27, 2005]

JUSTICE O'CONNOR, concurring.

I join in the Court's opinion. The First Amendment expresses our Nation's fundamental commitment to religious liberty by means of two provisions—one protecting the free exercise of religion, the other barring establishment of religion. They were written by the descendents of people who had come to this land precisely so that they could practice their religion freely. Together with the other First Amendment guarantees—of free speech, a free press, and the rights to assemble and petition—the Religion Clauses were designed to safeguard the freedom of conscience and belief that those immigrants had sought. They embody an idea that was once considered radical: Free people are entitled to free and diverse thoughts, which government ought neither to constrain nor to direct.

Reasonable minds can disagree about how to apply the Religion Clauses in a given case. But the goal of the Clauses is clear: to carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society. By enforcing the Clauses, we have kept religion a matter for the individual conscience, not for the prosecutor or bureaucrat. At a time when we see around the world the violent consequences of the assumption of religious authority by government, Americans may count

themselves fortunate: Our regard for constitutional boundaries has protected us from similar travails, while allowing private religious exercise to flourish. The well-known statement that "[w]e are a religious people," *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952), has proved true. Americans attend their places of worship more often than do citizens of other developed nations, R. Fowler, A. Hertzke, & L. Olson, Religion and Politics in America 28–29 (2d ed. 1999), and describe religion as playing an especially important role in their lives, Pew Global Attitudes Project, Among Wealthy Nations U. S. Stands Alone in its Embrace of Religion (Dec. 19, 2002). Those who would renegotiate the boundaries between church and state must therefore answer a difficult question: Why would we trade a system that has served us so well for one that has served others so poorly?

Our guiding principle has been James Madison's—that "[t]he Religion . . . of every man must be left to the conviction and conscience of every man." Memorial and Remonstrance Against Religious Assessments, 2 Writings of James Madison 183, 184 (G. Hunt ed. 1901) (hereinafter Memorial). To that end, we have held that the guarantees of religious freedom protect citizens from religious incursions by the States as well as by the Federal Government. *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 16 (1947); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940). Government may not coerce a person into worshiping against her will, nor prohibit her from worshiping according to it. It may not prefer one religion over another or promote religion over nonbelief. *Everson, supra,* at 15–16. It may not entangle itself with religion. *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664, 674 (1970). And government may not, by "endorsing religion or a religious practice," "mak[e] adherence to religion relevant to a person's standing in the political community." *Wallace* v. *Jaffree,* 472 U. S. 38, 69 (1985) (O'CONNOR, J., concurring in judgment).

O'CONNOR, J., concurring

When we enforce these restrictions, we do so for the same reason that guided the Framers—respect for religion's special role in society.  Our Founders conceived of a Republic receptive to voluntary religious expression, and provided for the possibility of judicial intervention when government action threatens or impedes such expression. Voluntary religious belief and expression may be as threatened when government takes the mantle of religion upon itself as when government directly interferes with private religious practices.  When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship. In the marketplace of ideas, the government has vast resources and special status.  Government religious expression therefore risks crowding out private observance and distorting the natural interplay between competing beliefs.  Allowing government to be a potential mouthpiece for competing religious ideas risks the sort of division that might easily spill over into suppression of rival beliefs. Tying secular and religious authority together poses risks to both.

Given the history of this particular display of the Ten Commandments, the Court correctly finds an Establishment Clause violation.  See *ante,* at 19–25.  The purpose behind the counties' display is relevant because it conveys an unmistakable message of endorsement to the reasonable observer.  See *Lynch* v. *Donnelly,* 465 U. S. 668, 690 (1984) (O'CONNOR, J., concurring).

It is true that many Americans find the Commandments in accord with their personal beliefs.  But we do not count heads before enforcing the First Amendment.  See *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and

officials and to establish them as legal principles to be
applied by the courts"). Nor can we accept the theory that
Americans who do not accept the Commandments' validity
are outside the First Amendment's protections. There is no
list of approved and disapproved beliefs appended to the
First Amendment—and the Amendment's broad terms
("free exercise," "establishment," "religion") do not admit of
such a cramped reading. It is true that the Framers lived
at a time when our national religious diversity was nei-
ther as robust nor as well recognized as it is now. They
may not have foreseen the variety of religions for which
this Nation would eventually provide a home. They surely
could not have predicted new religions, some of them born
in this country. But they did know that line-drawing
between religions is an enterprise that, once begun, has no
logical stopping point. They worried that "the same au-
thority which can establish Christianity, in exclusion of all
other Religions, may establish with the same ease any
particular sect of Christians, in exclusion of all other
Sects." Memorial 186. The Religion Clauses, as a result,
protect adherents of all religions, as well as those who
believe in no religion at all.

\*     \*     \*

We owe our First Amendment to a generation with a
profound commitment to religion and a profound commit-
ment to religious liberty—visionaries who held their faith
"with enough confidence to believe that what should be
rendered to God does not need to be decided and collected
by Caesar." *Zorach, supra,* at 324–325 (Jackson, J., dis-
senting). In my opinion, the display at issue was an estab-
lishment of religion in violation of our Constitution. For
the reasons given above, I join in the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

———————

No. 03–1693

———————

## McCREARY COUNTY, KENTUCKY, ET AL., PETITIONERS *v.* AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 27, 2005]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, and with whom JUSTICE KENNEDY joins as to Parts II and III, dissenting.

I would uphold McCreary County and Pulaski County, Kentucky's (hereinafter Counties) displays of the Ten Commandments. I shall discuss first, why the Court's oft repeated assertion that the government cannot favor religious practice is false; second, why today's opinion extends the scope of that falsehood even beyond prior cases; and third, why even on the basis of the Court's false assumptions the judgment here is wrong.

## I

## A

On September 11, 2001 I was attending in Rome, Italy an international conference of judges and lawyers, principally from Europe and the United States. That night and the next morning virtually all of the participants watched, in their hotel rooms, the address to the Nation by the President of the United States concerning the murderous attacks upon the Twin Towers and the Pentagon, in which thousands of Americans had been killed. The address ended, as Presidential addresses often do, with the prayer "God bless America." The next afternoon I was ap-

2    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

proached by one of the judges from a European country, who, after extending his profound condolences for my country's loss, sadly observed "How I wish that the Head of State of my country, at a similar time of national tragedy and distress, could conclude his address 'God bless _____.' It is of course absolutely forbidden."

That is one model of the relationship between church and state—a model spread across Europe by the armies of Napoleon, and reflected in the Constitution of France, which begins "France is [a] . . . secular . . . Republic." France Const., Art. 1, in 7 Constitutions of the Countries of the World, p. 1 (G. Flanz ed. 2000). Religion is to be strictly excluded from the public forum. This is not, and never was, the model adopted by America. George Washington added to the form of Presidential oath prescribed by Art. II, §1, cl. 8, of the Constitution, the concluding words "so help me God." See Blomquist, The Presidential Oath, the American National Interest and a Call for Presiprudence, 73 UMKC L. Rev. 1, 34 (2004). The Supreme Court under John Marshall opened its sessions with the prayer, "God save the United States and this Honorable Court." 1 C. Warren, The Supreme Court in United States History 469 (rev. ed. 1926). The First Congress instituted the practice of beginning its legislative sessions with a prayer. *Marsh* v. *Chambers*, 463 U. S. 783, 787 (1983). The same week that Congress submitted the Establishment Clause as part of the Bill of Rights for ratification by the States, it enacted legislation providing for paid chaplains in the House and Senate. *Id.*, at 788. The day after the First Amendment was proposed, the same Congress that had proposed it requested the President to proclaim "a day of public thanksgiving and prayer, to be observed, by acknowledging, with grateful hearts, the many and signal favours of Almighty God." See H. R. Jour., 1st Cong., 1st Sess. 123 (1826 ed.); see also Sen. Jour., 1st Sess., 88 (1820 ed.). President Washington offered the

first Thanksgiving Proclamation shortly thereafter, devoting November 26, 1789 on behalf of the American people "'to the service of that great and glorious Being who is the beneficent author of all the good that is, that was, or that will be,'" *Van Orden* v. *Perry*, *ante*, at 7–8 (plurality opinion) (quoting President Washington's first Thanksgiving Proclamation), thus beginning a tradition of offering gratitude to God that continues today. See *Wallace* v. *Jaffree*, 472 U. S. 38, 100–103 (1985) (REHNQUIST, J., dissenting).[1] The same Congress also reenacted the Northwest Territory Ordinance of 1787, 1 Stat. 50, Article III of which provided: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." *Id.*, at 52, n. *(a).* And of course the First Amendment itself accords religion (and no other manner of belief) special constitutional protection.

These actions of our First President and Congress and the Marshall Court were not idiosyncratic; they reflected the beliefs of the period. Those who wrote the Constitution believed that morality was essential to the well-being of society and that encouragement of religion was the best way to foster morality. The "fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself." *School Dist. of Abington Township* v. *Schempp,* 374 U. S. 203, 213 (1963). See Underkuffler-Freund, The Separation of the Religious and the Secular: A Foundational Challenge to First-Amendment Theory, 36 Wm. & Mary L. Rev. 837, 896–918 (1995). President

---

[1] See, *e.g.*, President's Thanksgiving Day 2004 Proclamation (Nov. 23, 2004), available at http://www.whitehouse.gov/news/releases/2004/11/ 20041123-4.html (all internet materials as visited June 24, 2005 and available in Clerk of Court's case file).

4     MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

Washington opened his Presidency with a prayer, see
Inaugural Addresses of the Presidents of the United
States 1, 2 (1989), and reminded his fellow citizens at the
conclusion of it that "reason and experience both forbid us
to expect that National morality can prevail in exclusion of
religious principle." Farewell Address (1796), reprinted in
35 Writings of George Washington 229 (J. Fitzpatrick ed.
1940). President John Adams wrote to the Massachusetts
Militia, "we have no government armed with power capa-
ble of contending with human passions unbridled by mo-
rality and religion. . . . Our Constitution was made only
for a moral and religious people. It is wholly inadequate
to the government of any other." Letter (Oct. 11, 1798),
reprinted in 9 Works of John Adams 229 (C. Adams ed.
1971). Thomas Jefferson concluded his second inaugural
address by inviting his audience to pray:

> "I shall need, too, the favor of that Being in whose
> hands we are, who led our fathers, as Israel of old,
> from their native land and planted them in a country
> flowing with all the necessaries and comforts of life;
> who has covered our infancy with His providence and
> our riper years with His wisdom and power and to
> whose goodness I ask you to join in supplications with
> me that He will so enlighten the minds of your ser-
> vants, guide their councils, and prosper their meas-
> ures that whatsoever they do shall result in your
> good, and shall secure to you the peace, friendship,
> and approbation of all nations." Inaugural Addresses
> of the Presidents of the United States, at 18, 22–23.

James Madison, in his first inaugural address, likewise
placed his confidence "in the guardianship and guidance of
that Almighty Being whose power regulates the destiny of
nations, whose blessings have been so conspicuously dis-
pensed to this rising Republic, and to whom we are bound
to address our devout gratitude for the past, as well as our

fervent supplications and best hopes for the future." *Id.*, at 25, 28.

Nor have the views of our people on this matter significantly changed. Presidents continue to conclude the Presidential oath with the words "so help me God." Our legislatures, state and national, continue to open their sessions with prayer led by official chaplains. The sessions of this Court continue to open with the prayer "God save the United States and this Honorable Court." Invocation of the Almighty by our public figures, at all levels of government, remains commonplace. Our coinage bears the motto "IN GOD WE TRUST." And our Pledge of Allegiance contains the acknowledgment that we are a Nation "under God." As one of our Supreme Court opinions rightly observed, "We are a religious people whose institutions presuppose a Supreme Being." *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952), repeated with approval in *Lynch* v. *Donnelly*, 465 U. S. 668, 675 (1984); *Marsh*, 463 U. S., at 792; *Abington Township, supra*, at 213.

With all of this reality (and much more) staring it in the face, how can the Court *possibly* assert that "'the First Amendment mandates governmental neutrality between . . . religion and nonreligion,'" *ante*, at 11, and that "[m]anifesting a purpose to favor . . . adherence to religion generally," *ante*, at 12, is unconstitutional? Who says so? Surely not the words of the Constitution. Surely not the history and traditions that reflect our society's constant understanding of those words. Surely not even the current sense of our society, recently reflected in an Act of Congress adopted *unanimously* by the Senate and with only 5 nays in the House of Representatives, see 148 Cong. Rec. S6226 (2002); *id.*, at H7186, criticizing a Court of Appeals opinion that had held "under God" in the Pledge of Allegiance unconstitutional. See Act of Nov. 13, 2002, §§1(9), 2(a), 3(a), 116 Stat. 2057, 2058, 2060–2061 (reaffirming the Pledge of Allegiance and the National Motto

6    MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

("In God We Trust") and stating that the Pledge of Allegiance is "clearly consistent with the text and intent of the Constitution"). Nothing stands behind the Court's assertion that governmental affirmation of the society's belief in God is unconstitutional except the Court's own say-so, citing as support only the unsubstantiated say-so of earlier Courts going back no farther than the mid-20th century. See *ante*, at 11, citing *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327, 335 (1987), in turn citing *Lemon* v. *Kurtzman*, 403 U. S. 602, 612 (1971), in turn citing *Board of Ed. of Central School Dist. No. 1* v. *Allen,* 392 U. S. 236, 243 (1968), in turn quoting *Abington Township, supra*, at 222, in turn citing *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 15 (1947).[2] And it is, moreover, a thoroughly discredited say-so. It is discredited, to begin with, because a majority of the Justices on the current Court (including at least one Member of today's majority) have, in separate opinions, repudiated the brain-spun "*Lemon* test" that embodies the supposed principle of neutrality between religion and irreligion. See *Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. 384, 398–399 (1993) (SCALIA, J., concurring in judgment) (collecting criticism of *Lemon*); *Van Orden, ante*, at 1, 6 (THOMAS, J., concurring); *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet,* 512 U. S. 687, 720 (1994) (O'CONNOR, J., concurring in part and concurring in judgment); *County of Allegheny* v. *American Civil Liber-*

---

[2] The fountainhead of this jurisprudence, *Everson* v. *Board of Ed. of Ewing*, based its dictum that "[n]either a state nor the Federal Government . . . can pass laws which . . . aid all religions," 330 U. S., at 15, on a review of historical evidence that focused on the debate leading up to the passage of the Virginia Bill for Religious Liberty, see *id.*, at 11–13. A prominent commentator of the time remarked (after a thorough review of the evidence himself) that it appeared the Court had been "sold . . . a bill of goods." Corwin, The Supreme Court as National School Board, 14 Law & Contemp. Prob. 3, 16 (1949).

*ties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 655–656, 672–673 (1989) (KENNEDY, J., concurring in judgment in part and dissenting in part); *Wallace,* 472 U. S., at 112 (REHNQUIST, J., dissenting); see also *Committee for Public Ed. and Religious Liberty* v. *Regan,* 444 U. S. 646, 671 (1980) (STEVENS, J., dissenting) (disparaging "the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in *Lemon*"). And it is discredited because the Court has not had the courage (or the foolhardiness) to apply the neutrality principle consistently.

What distinguishes the rule of law from the dictatorship of a shifting Supreme Court majority is the absolutely indispensable requirement that judicial opinions be grounded in consistently applied principle. That is what prevents judges from ruling now this way, now that— thumbs up or thumbs down—as their personal preferences dictate. Today's opinion forthrightly (or actually, somewhat less than forthrightly) admits that it does not rest upon consistently applied principle. In a revealing footnote, *ante,* at 11, n. 10, the Court acknowledges that the "Establishment Clause doctrine" it purports to be applying "lacks the comfort of categorical absolutes." What the Court means by this lovely euphemism is that sometimes the Court chooses to decide cases on the principle that government cannot favor religion, and sometimes it does not. The footnote goes on to say that "[i]n special instances we have found good reason" to dispense with the principle, but "[n]o such reasons present themselves here." *Ibid.* It does not identify all of those "special instances," much less identify the "good reason" for their existence.

I have cataloged elsewhere the variety of circumstances in which this Court—even *after* its embrace of *Lemon*'s stated prohibition of such behavior—has approved government action "undertaken with the specific intention of improving the position of religion," *Edwards* v. *Aguillard,* 482 U. S. 578, 616 (1987) (SCALIA, J., dissenting). See *id.,*

616–618.  Suffice it to say here that when the government relieves churches from the obligation to pay property taxes, when it allows students to absent themselves from public school to take religious classes, and when it exempts religious organizations from generally applicable prohibitions of religious discrimination, it surely means to bestow a benefit on religious practice—but we have approved it.  See *Amos, supra*, at 338 (exemption from federal prohibition of religious discrimination by employers); *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664, 673 (1970) (property tax exemption for church property); *Zorach,* 343 U. S., at 308, 315 (law permitting students to leave public school for the purpose of receiving religious education).  Indeed, we have even approved (post-*Lemon*) government-led prayer to God.  In *Marsh* v. *Chambers*, *supra*, the Court upheld the Nebraska State Legislature's practice of paying a chaplain to lead it in prayer at the opening of legislative sessions.  The Court explained that "[t]o invoke Divine guidance on a public body entrusted with making the laws is not . . . an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country."  463 U. S., at 792.  (Why, one wonders, is not respect for the Ten Commandments a tolerable acknowledgment of beliefs widely held among the people of this country?)

The only "good reason" for ignoring the neutrality principle set forth in any of these cases was the antiquity of the practice at issue.  See *Marsh*, *supra*, at 786–792, 794; *Walz*, *supra*, at 676–680.  That would be a good reason for finding the neutrality principle a mistaken interpretation of the Constitution, but it is hardly a good reason for letting an unconstitutional practice continue.  We did not hide behind that reason in *Reynolds* v. *Sims*, 377 U. S. 533 (1964), which found unconstitutional bicameral state legislatures of a sort that had existed since the beginning

of the Republic. And almost monthly, it seems, the Court has not shrunk from invalidating aspects of criminal procedure and penology of similar vintage. See, *e.g.*, *Deck* v. *Missouri*, 544 U. S. ___, ___ (2005) (slip op., at 10–11) (invalidating practice of shackling defendants absent "special circumstances"); *id.*, at ___ (slip op., at 7–11) (THOMAS, J., dissenting); *Roper* v. *Simmons*, 543 U. S. ___, ___ (2005) (slip op., at 14) (invalidating practice of executing under-18-year-old offenders); *id.*, at ___ (slip op., at 2, n. 1) (SCALIA, J., dissenting). What, then, could be the genuine "good reason" for occasionally ignoring the neutrality principle? I suggest it is the instinct for self-preservation, and the recognition that the Court, which "has no influence over either the sword or the purse," The Federalist No. 78, p. 412 (J. Pole ed. 2005), cannot go too far down the road of an enforced neutrality that contradicts both historical fact and current practice without losing all that sustains it: the willingness of the people to accept its interpretation of the Constitution as definitive, in preference to the contrary interpretation of the democratically elected branches.

Besides appealing to the demonstrably false principle that the government cannot favor religion over irreligion, today's opinion suggests that the posting of the Ten Commandments violates the principle that the government cannot favor one religion over another. See *ante*, at 19; see also *Van Orden*, *ante*, at 11–13 (STEVENS, J., dissenting). That is indeed a valid principle where public aid or assistance to religion is concerned, see *Zelman* v. *Simmons-Harris,* 536 U. S. 639, 652 (2002), or where the free exercise of religion is at issue, *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 532–533 (1993); *id.*, at 557–558 (SCALIA, J., concurring in part and concurring in judgment), but it necessarily applies in a more limited sense to public acknowledgment of the Creator. If religion in the public forum had to be entirely nondenominational,

10     MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

there could be no religion in the public forum at all.  One
cannot say the word "God," or "the Almighty," one cannot
offer public supplication or thanksgiving, without contra-
dicting the beliefs of some people that there are many
gods, or that God or the gods pay no attention to human
affairs.  With respect to public acknowledgment of reli-
gious belief, it is entirely clear from our Nation's historical
practices that the Establishment Clause permits this
disregard of polytheists and believers in unconcerned
deities, just as it permits the disregard of devout atheists.
The Thanksgiving Proclamation issued by George Wash-
ington at the instance of the First Congress was scrupu-
lously nondenominational—but it was monotheistic. [3]  In
*Marsh* v. *Chambers, supra,* we said that the fact the par-
ticular prayers offered in the Nebraska Legislature were
"in the Judeo-Christian tradition," *id.*, at 793, posed no
additional problem, because "there is no indication that
the prayer opportunity has been exploited to proselytize or
advance any one, or to disparage any other, faith or be-
lief," *id.*, at 794–795.

Historical practices thus demonstrate that there is a
distance between the acknowledgment of a single Creator
and the establishment of a religion.  The former is, as
*Marsh* v. *Chambers* put it, "a tolerable acknowledgment of
beliefs widely held among the people of this country."  *Id.*,
at 792.  The three most popular religions in the United
States, Christianity, Judaism, and Islam—which com-

———————

[3] The Court thinks it "surpris[ing]" and "truly remarkable" to believe
that "the deity the Framers had in mind" (presumably in all the in-
stances of invocation of the deity I have cited) "was the God of monothe-
ism."  *Ante,* at 32.  This reaction would be more comprehensible if the
Court could suggest what other God (in the singular, and with a capital
G) there *is*, other than "the God of monotheism."  This is not *necessarily*
the Christian God (though if it were, one would expect Christ regu-
larly to be invoked, which He is not); but it is *inescapably* the God of
monotheism.

bined account for 97.7% of all believers—are monotheistic. See U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States: 2004–2005, p. 55 (124th ed. 2004) (Table No. 67). All of them, moreover (Islam included), believe that the Ten Commandments were given by God to Moses, and are divine prescriptions for a virtuous life. See 13 Encyclopedia of Religion 9074 (2d ed. 2005); The Qur'an 104 (M. Haleem trans. 2004). Publicly honoring the Ten Commandments is thus indistinguishable, insofar as discriminating against other religions is concerned, from publicly honoring God. Both practices are recognized across such a broad and diverse range of the population—from Christians to Muslims—that they cannot be reasonably understood as a government endorsement of a particular religious viewpoint.[4]

## B

A few remarks are necessary in response to the criticism of this dissent by the Court, as well as JUSTICE STEVENS' criticism in the related case of *Van Orden* v. *Perry, ante,* p. 1. JUSTICE STEVENS' writing is largely devoted to an attack upon a straw man. "[R]eliance on early religious proclamations and statements made by the Founders is . . . problematic," he says, "because those views were not espoused at the Constitutional Convention in 1787 nor enshrined in the Constitution's text." *Van Orden, ante,* at 18–19 (dissenting opinion) (footnote omitted). But I have not relied upon (as he and the Court in this case do) mere "proclamations and statements" of the Founders. I have

———————

[4] This is not to say that a display of the Ten Commandments could never constitute an impermissible endorsement of a particular religious view. The Establishment Clause would prohibit, for example, governmental endorsement of a particular version of the Decalogue as authoritative. Here the display of the Ten Commandments alongside eight secular documents, and the plaque's explanation for their inclusion, make clear that they were not posted to take sides in a theological dispute.

12 McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

relied primarily upon official acts and official proclamations of the United States or of the component branches of its Government, including the First Congress's beginning of the tradition of legislative prayer to God, its appointment of congressional chaplains, its legislative proposal of a Thanksgiving Proclamation, and its reenactment of the Northwest Territory Ordinance; our first President's issuance of a Thanksgiving Proclamation; and invocation of God at the opening of sessions of the Supreme Court. The only mere "proclamations and statements" of the Founders I have relied upon were statements of Founders who occupied federal office, and spoke in at least a quasi-official capacity—Washington's prayer at the opening of his Presidency and his Farewell Address, President John Adams' letter to the Massachusetts Militia, and Jefferson's and Madison's inaugural addresses. The Court and JUSTICE STEVENS, by contrast, appeal to no official or even quasi-official action in support of their view of the Establishment Clause—only James Madison's Memorial and Remonstrance Against Religious Assessments, written before the federal Constitution had even been proposed, two letters written by Madison long after he was President, and the quasi-official *inaction* of Thomas Jefferson in refusing to issue a Thanksgiving Proclamation. See *ante*, at 30–31; *Van Orden*, *ante*, at 19 (STEVENS, J., dissenting). The Madison Memorial and Remonstrance, dealing as it does with enforced contribution to religion rather than public acknowledgment of God, is irrelevant; one of the letters is utterly ambiguous as to the point at issue here, and should not be read to contradict Madison's statements in his first inaugural address, quoted earlier; even the other letter does not disapprove public acknowledgment of God, unless one posits (what Madison's own actions as President would contradict) that reference to God contradicts "the equality of *all* religious sects." See Letter from James Madison to Edward Livingston (July 10, 1822), in 5

The Founders' Constitution 105–106 (P. Kurland & R. Lerner eds. 1987). And as to Jefferson: the notoriously self-contradicting Jefferson did not choose to have his nonauthorship of a Thanksgiving Proclamation inscribed on his tombstone. What he did have inscribed was his authorship of the Virginia Statute for Religious Freedom, a governmental act which begins "Whereas Almighty God hath created the mind free . . . ." Va. Code Ann. §57–1 (Lexis 2003).

It is no answer for JUSTICE STEVENS to say that the understanding that these official and quasi-official actions reflect was not "enshrined in the Constitution's text." *Van Orden*, *ante*, at 18 (dissenting opinion). The Establishment Clause, upon which JUSTICE STEVENS would rely, *was* enshrined in the Constitution's text, and these official actions show *what it meant*. There were doubtless some who thought it should have a broader meaning, but those views were plainly rejected. JUSTICE STEVENS says that reliance on these actions is "bound to paint a misleading picture," *Van Orden*, *ante*, at 19, but it is hard to see why. What is more probative of the meaning of the Establishment Clause than the actions of the very Congress that proposed it, and of the first President charged with observing it?

JUSTICE STEVENS also appeals to the undoubted fact that some in the founding generation thought that the Religion Clauses of the First Amendment should have a *narrower* meaning, protecting only the Christian religion or perhaps only Protestantism. See *Van Orden*, *ante*, at 20–22. I am at a loss to see how this helps his case, except by providing a cloud of obfuscating smoke. (Since most thought the Clause permitted government invocation of monotheism, and some others thought it permitted government invocation of Christianity, he proposes that it be construed not to permit any government invocation of religion at all.) At any rate, those narrower views of the

14    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

Establishment Clause were as clearly rejected as the more expansive ones. Washington's First Thanksgiving Proclamation is merely an example. *All* of the actions of Washington and the First Congress upon which I have relied, virtually all Thanksgiving Proclamations throughout our history,[5] and *all* the other examples of our Government's favoring religion that I have cited, have invoked God, but not Jesus Christ.[6]  Rather than relying upon JUSTICE STEVENS' assurance that "[t]he original understanding of the type of 'religion' that qualified for constitutional protection under the First amendment certainly did not include . . . followers of Judaism and Islam," *Van Orden*, *ante*, at 22; see also *ante*, at 32–33, I would prefer to take the word of George Washington, who, in his famous Letter to the Hebrew Congregation of Newport, Rhode Island, wrote that,

> "All possess alike liberty of conscience and immunities of citizenship.  It is now no more that toleration is spoken of, as if it was by the indulgence of one class of

───────────

[5] The two exceptions are the March 23, 1798 proclamation of John Adams, which asks God "freely to remit all our offenses" "through the Redeemer of the World," http://www.pilgrimhall.org/ThanxProc1789.htm, and the November 17, 1972 proclamation of Richard Nixon, which stated, "From Moses at the Red Sea to Jesus preparing to feed the multitudes, the Scriptures summon us to words and deeds of gratitude, even before divine blessings are fully perceived," Presidential Proclamation No. 4170, 37 Fed. Reg. 24647 (1972).

[6] JUSTICE STEVENS finds that Presidential inaugural and farewell speeches (which are the only speeches upon which I have relied) do not violate the Establishment Clause only because everyone knows that they express the personal religious views of the speaker, and not government policy.  See *Van Orden*, *ante,* at 17–18 (dissenting opinion). This is a peculiar stance for one who has voted that a student-led invocation at a high school football game and a rabbi-led invocation at a high school graduation *did* constitute the sort of governmental endorsement of religion that the Establishment Clause forbids.  See *Santa Fe Independent School Dist.* v. *Doe,* 530 U. S. 290 (2000); *Lee* v. *Weisman,* 505 U. S. 577 (1992).

people, that another enjoyed the exercise of their in-
herent natural rights." 6 The Papers of George Wash-
ington, Presidential Series 285 (D. Twohig et al. eds.
1996).

The letter concluded, by the way, with an invocation of the
one God:

> "May the father of all mercies scatter light and not
> darkness in our paths, and make us all in our several
> vocations useful here, and in his own due time and
> way everlastingly happy." *Ibid.*

JUSTICE STEVENS says that if one is serious about fol-
lowing the original understanding of the Establishment
Clause, he must repudiate its incorporation into the Four-
teenth Amendment, and hold that it does not apply
against the States. See *Van Orden*, *ante*, at 24–26 (dis-
senting opinion). This is more smoke. JUSTICE STEVENS
did not feel that way last Term, when he joined an opinion
insisting upon the original meaning of the Confrontation
Clause, but nonetheless applying it against the State of
Washington. See *Crawford* v. *Washington,* 541 U. S. 36
(2004). The notion that incorporation empties the incorpo-
rated provisions of their original meaning has no support
in either reason or precedent.

JUSTICE STEVENS argues that original meaning should
not be the touchstone anyway, but that we should rather
"expoun[d] the meaning of constitutional provisions with
one eye towards our Nation's history and the other fixed
on its democratic aspirations." *Van Orden*, *ante*, at 27–28
(dissenting opinion). This is not the place to debate the
merits of the "living Constitution," though I must observe
that JUSTICE STEVENS' quotation from *McCulloch* v. *Mary-
land,* 4 Wheat. 316, 407 (1819), refutes rather than sup-
ports that approach.[7] Even assuming, however, that the

—————

[7] See Scalia, Originalism: The Lesser Evil, 57 Cincinnati L. Rev. 852–

16    MᴄCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Sᴄᴀʟɪᴀ, J., dissenting

meaning of the Constitution ought to change according to "democratic aspirations," why are those aspirations to be found in Justices' notions of what the Establishment Clause ought to mean, rather than in the democratically adopted dispositions of our current society? As I have observed above, numerous provisions of our laws and numerous continuing practices of our people demonstrate that the government's invocation of God (and hence the government's invocation of the Ten Commandments) is unobjectionable—including a statute enacted by Congress almost unanimously less than three years ago, stating that "under God" in the Pledge of Allegiance is constitutional, see 116 Stat., at 2058. To ignore all this is not to give effect to "democratic aspirations" but to frustrate them.

Finally, I must respond to JUSTICE STEVENS' assertion that I would "marginaliz[e] the belief systems of more than 7 million Americans" who adhere to religions that are not monotheistic. *Van Orden*, *ante*, at 13–14, n. 18 (dissenting opinion). Surely that is a gross exaggeration. The beliefs of those citizens are entirely protected by the Free Exercise Clause, and by those aspects of the Establishment Clause that do not relate to government acknowledgment of the Creator. Invocation of God despite their beliefs is permitted not because nonmonotheistic religions cease to be religions recognized by the religion clauses of the First Amendment, but because governmental invocation of God is not an establishment. JUSTICE STEVENS fails to recognize that in the context of public acknowledgments of God there are legitimate *competing* interests: On the one hand, the interest of that minority in not feeling "excluded"; but on the other, the interest of the overwhelming majority of religious believers in being able to give God thanks and supplication *as a people,* and with

--------

853 (1989).

respect to our national endeavors. Our national tradition has resolved that conflict in favor of the majority.[8] It is not for this Court to change a disposition that accounts, many Americans think, for the phenomenon remarked upon in a quotation attributed to various authors, including Bismarck, but which I prefer to associate with Charles de Gaulle: "God watches over little children, drunkards, and the United States of America."

## II

As bad as the *Lemon* test is, it is worse for the fact that, since its inception, its seemingly simple mandates have been manipulated to fit whatever result the Court aimed to achieve. Today's opinion is no different. In two respects it modifies *Lemon* to ratchet up the Court's hostility to religion. First, the Court justifies inquiry into legislative purpose, not as an end itself, but as a means to ascertain the appearance of the government action to an "'objective observer.'" *Ante*, at 13. Because in the Court's view the true danger to be guarded against is that the objective observer would feel like an "outside[r]" or "not [a] full membe[r] of the political community," its inquiry focuses not on the *actual purpose* of government action, but the "purpose apparent from government action." *Ante*, at 12. Under this approach, even if a government could show that its actual purpose was not to advance religion, it would presumably violate the Constitution as long as the Court's objective observer would think otherwise. See *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515

---

[8] Nothing so clearly demonstrates the utter inconsistency of our Establishment Clause jurisprudence as JUSTICE O'CONNOR's stirring concurrence in the present case. "[W]e do not," she says, "count heads before enforcing the First Amendment." *Ante*, at 4. But JUSTICE O'CONNOR joined the opinion of the Court in *Marsh* v. *Chambers*, 463 U. S. 783 (1983) which held legislative prayer to be "a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.*, at 792.

18    MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

U.S. 753, 776–777 (1995) (O'CONNOR, J., concurring in part and concurring in judgment) (stating that "when the reasonable observer would view a government practice as endorsing religion, . . . it is our *duty* to hold the practice invalid," even if the law at issue was neutral and the benefit conferred on the religious entity was incidental).

I have remarked before that it is an odd jurisprudence that bases the unconstitutionality of a government practice that does not *actually* advance religion on the hopes of the government that it *would* do so. See *Edwards*, 482 U. S., at 639. But that oddity pales in comparison to the one invited by today's analysis: the legitimacy of a government action with a wholly secular effect would turn on the *misperception* of an imaginary observer that the government officials behind the action had the intent to advance religion.

Second, the Court replaces *Lemon*'s requirement that the government have "*a* secular . . . purpose," 403 U. S., at 612 (emphasis added), with the heightened requirement that the secular purpose "predominate" over any purpose to advance religion. *Ante*, at 15–17. The Court treats this extension as a natural outgrowth of the longstanding requirement that the government's secular purpose not be a sham, but simple logic shows the two to be unrelated. If the government's proffered secular purpose is not genuine, then the government has no secular purpose at all. The new demand that secular purpose predominate contradicts *Lemon*'s more limited requirement, and finds no support in our cases. In all but one of the five cases in which this Court has invalidated a government practice on the basis of its purpose to benefit religion, it has first declared that the statute was motivated entirely by the desire to advance religion. See *Santa Fe Independent School Dist.* v. *Doe,* 530 U. S. 290, 308–309 (2000) (dismissing the school district's proffered secular purposes as shams); *Wallace*, 472 U. S., at 56 (finding "*no* secular purpose") (emphasis

added); *Stone* v. *Graham*, 449 U. S. 39, 41 (1980) *(per curiam)* (finding that "Kentucky's statute requiring the posting of the Ten Commandments in public school rooms has *no secular legislative purpose*") (emphasis added); *Epperson* v. *Arkansas*, 393 U. S. 97, 107–109 (1968). In *Edwards*, *supra*, the Court did say that the state action was invalid because its "primary" or "preeminent" purpose was to advance a particular religious belief, 482 U. S., at 590, 593, 594, but that statement was unnecessary to the result, since the Court rejected the State's only proffered secular purpose as a sham. See *id.*, at 589.

I have urged that *Lemon*'s purpose prong be abandoned, because (as I have discussed in Part I) even an *exclusive* purpose to foster or assist religious practice is not necessarily invalidating. But today's extension makes things even worse. By shifting the focus of *Lemon*'s purpose prong from the search for a genuine, secular motivation to the hunt for a predominantly religious purpose, the Court converts what has in the past been a fairly limited inquiry into a rigorous review of the full record.[9] Those responsible for the adoption of the Religion Clauses would surely regard it as a bitter irony that the religious values they

_____

[9] The Court's reflexive skepticism of the government's asserted secular purposes is flatly inconsistent with the deferential approach taken by our previous Establishment Clause cases. We have repeated many times that, where a court undertakes the sensitive task of reviewing a government's asserted purpose, it must take the government at its word absent compelling evidence to the contrary. See, *e.g.*, *Edwards* v. *Aguillard,* 482 U. S. 578, 586 (stating that "the Court is . . . deferential to a State's articulation of a secular purpose," unless that purpose is insincere or a sham); *Mueller* v. *Allen,* 463 U. S. 388, 394–395 (1983) (ascribing the Court's disinclination to invalidate government practices under *Lemon*'s purpose prong to its "reluctance to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute"); see also *Wallace* v. *Jaffree*, 472 U. S. 38, 74 (O'CONNOR, J., concurring in judgment) ("the inquiry into the purpose of the legislature . . . should be deferential and limited").

20    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

designed those Clauses to *protect* have now become so
distasteful to this Court that if they constitute anything
more than a subordinate motive for government action
they will invalidate it.

## III

Even accepting the Court's *Lemon*-based premises, the
displays at issue here were constitutional.

## A

To any person who happened to walk down the hallway
of the McCreary or Pulaski County Courthouse during the
roughly nine months when the Foundations Displays were
exhibited, the displays must have seemed unremarkable—
if indeed they were noticed at all. The walls of both court-
houses were already lined with historical documents and
other assorted portraits; each Foundations Display was
exhibited in the same format as these other displays and
nothing in the record suggests that either County took
steps to give it greater prominence.

Entitled "The Foundations of American Law and Gov-
ernment Display," each display consisted of nine equally
sized documents: the original version of the Magna Carta,
the Declaration of Independence, the Bill of Rights, the
Star Spangled Banner, the Mayflower Compact of 1620, a
picture of Lady Justice, the National Motto of the United
States ("In God We Trust"), the Preamble to the Kentucky
Constitution, and the Ten Commandments. The displays
did not emphasize any of the nine documents in any way:
The frame holding the Ten Commandments was of the
same size and had the same appearance as that which
held each of the other documents. See 354 F. 3d 438, 443
(CA6 2003).

Posted with the documents was a plaque, identifying the
display, and explaining that it "contains documents that
played a significant role in the foundation of our system of

law and government." *Ibid*. The explanation related to the Ten Commandments was third in the list of nine and did not serve to distinguish it from the other documents. It stated:

> "The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that, 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness.' The Ten Commandments provide the moral background of the Declaration of Independence and the foundation of our legal tradition." *Ibid*.

### B

On its face, the Foundations Displays manifested the purely secular purpose that the Counties asserted before the District Court: "to display documents that played a significant role in the foundation of our system of law and government." Affidavit of Judge Jimmie Green in Support of Defendants' Opposition to Plaintiffs' Motion for Contempt or, in the Alternative, for Supplemental Preliminary Injunction in Civ. A. No. 99–507 (ED Ky.), p. 2. That the Displays included the Ten Commandments did not transform their apparent secular purpose into one of impermissible advocacy for Judeo-Christian beliefs. Even an isolated display of the Decalogue conveys, at worst, "an equivocal message, perhaps of respect for Judaism, for religion in general, or for law." *Allegheny County*, 492 U. S., at 652 (STEVENS, J., concurring in part and dissenting in part). But when the Ten Commandments appear alongside other documents of secular significance in a display devoted to the foundations of American law and government, the context communicates that the Ten

22    MᴄCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Sᴄᴀʟɪᴀ, J., dissenting

Commandments are included, not to teach their binding nature as a religious text, but to show their unique contribution to the development of the legal system. See *id.,* at 652–653. This is doubly true when the display is introduced by a document that informs passersby that it "contains documents that played a significant role in the foundation of our system of law and government."

The same result follows if the Ten Commandments display is viewed in light of the government practices that this Court has countenanced in the past. The acknowledgment of the contribution that religion in general, and the Ten Commandments in particular, have made to our Nation's legal and governmental heritage is surely no more of a step towards establishment of religion than was the practice of legislative prayer we approved in *Marsh* v. *Chambers,* 463 U. S. 783 (1983), and it seems to be on par with the inclusion of a crèche or a menorah in a "Holiday" display that incorporates other secular symbols, see *Lynch*, *supra*, at 679–680; *Allegheny County*, *supra*, at 621. The parallels between this case and *Marsh* and *Lynch* are sufficiently compelling that they ought to decide this case, even under the Court's misguided Establishment Clause jurisprudence.[10]

––––––––––

[10]The Court's only response is that the inclusion of the Ten Commandments in a display about the foundations of American law reflects "a purpose to call on citizens to act in prescribed ways as a personal response to divine authority," in a way that legislative prayer and the inclusion of a crèche in a Holiday display do not. See *ante*, at 30, n. 24. That might be true if the Commandments were displayed by themselves in a church, or even in someone's home. It seems to me patently untrue—given the Decalogue's "undeniable historical meaning" as a symbol of the religious foundations of law, see *Van Orden, ante,* at 11 (plurality opinion)—when they are posted in a courthouse display of historical documents. The observer would no more think himself "called upon to act" in conformance with the Commandments than he would think himself called upon to think and act like William Bradford because of the courthouse posting of the Mayflower Compact—

Acknowledgment of the contribution that religion has made to our Nation's legal and governmental heritage partakes of a centuries-old tradition.  Members of this Court have themselves often detailed the degree to which religious belief pervaded the National Government during the founding era.  See *Lynch*, *supra*, at 674–678; *Marsh*, *supra*, at 786–788; *Lee* v. *Weisman*, 505 U. S. 577, 633–636 (1992) (SCALIA, J., dissenting); *Wallace*, 472 U. S. at 100–106 (REHNQUIST, J., dissenting); *Engel* v. *Vitale*, 370 U. S. 421, 446–450, and n. 3 (1962) (Stewart, J., dissenting). Display of the Ten Commandments is well within the mainstream of this practice of acknowledgment.  Federal, State, and local governments across the Nation have engaged in such display.[11]  The Supreme Court Building itself includes depictions of Moses with the Ten Commandments in the Courtroom and on the east pediment of the building, and symbols of the Ten Commandments "adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Court-room." *Van Orden*, *ante*, at 9 (plurality opinion).  Similar depictions of the Decalogue appear on public buildings and monuments throughout our Nation's Capital.  *Ibid*.  The

––––––––––

especially when he is *told* that the exhibit consists of documents that contributed to American law and government.

[11]The significant number of cases involving Ten Commandments displays in the last two years suggests the breadth of their appearance. See, *e.g.*, *Books* v. *Elkhart County*, 401 F. 3d 857, 858–859 (CA7 2005) (Ten Commandments included in a display identical to the Foundations display); *Mercier* v. *Fraternal Order of Eagles*, 395 F. 3d 693, 696 (CA7 2005) (Ten Commandments monument in city park since 1965); *Modrovich* v. *Allegheny County*, 385 F. 3d 397, 399 (CA3 2004) (Ten Commandments plaque, donated in 1918, on wall of Allegheny County Courthouse); *Freethought Soc. of Greater Philadelphia* v. *Chester County*, 334 F. 3d 247, 249 (CA3 2003) (Ten Commandment plaque, donated in 1920, on wall of Chester County Courthouse); *King* v. *Richmond County*, 331 F. 3d 1271, 1273–1274 (CA11 2003) (Ten Commandments depicted in county seal since 1872).

24    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

frequency of these displays testifies to the popular understanding that the Ten Commandments are a foundation of the rule of law, and a symbol of the role that religion played, and continues to play, in our system of government.

Perhaps in recognition of the centrality of the Ten Commandments as a widely recognized symbol of religion in public life, the Court is at pains to dispel the impression that its decision will require governments across the country to sandblast the Ten Commandments from the public square. See *ante*, at 26. The constitutional problem, the Court says, is with the Counties' *purpose* in erecting the Foundations Displays, not the displays themselves. The Court adds in a footnote: "One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage." *Ante*, at 18, n. 14.

This inconsistency may be explicable in theory, but I suspect that the "objective observer" with whom the Court is so concerned will recognize its absurdity in practice. By virtue of details familiar only to the parties to litigation and their lawyers, McCreary and Pulaski Counties, Kentucky, and Rutherford County, Tennessee, have been ordered to remove the same display that appears in courthouses from Mercer County, Kentucky to Elkhart County, Indiana. Compare *American Civil Liberties Union of Tenn.* v. *Rutherford County*, 209 F. Supp. 2d 799, 808–809 (MD Tenn. 2002) (holding Foundations Display to be unconstitutional based on prior actions of county commission) with *Books* v. *Elkhart County*, 401 F. 3d 857, 869 (CA7 2005) (sustaining Foundations Display as "secular . . . in its purpose and effect"); *American Civil Liberties Union of Ky.* v. *Mercer County*, 219 F. Supp. 2d 777, 787–789 (ED Ky. 2002) (rejecting Establishment Clause challenge to an identical Foundations Display and distinguishing

*McCreary County* on the ground that the County's purpose had not been "tainted with any prior history"). Displays erected in silence (and under the direction of good legal advice) are permissible, while those hung after discussion and debate are deemed unconstitutional. Reduction of the Establishment Clause to such minutiae trivializes the Clause's protection against religious establishment; indeed, it may inflame religious passions by making the passing comments of every government official the subject of endless litigation.

C

In any event, the Court's conclusion that the Counties exhibited the Foundations Displays with the purpose of promoting religion is doubtful. In the Court's view, the impermissible motive was apparent from the initial displays of the Ten Commandments all by themselves: When that occurs, the Court says, "a religious object is unmistakable." *Ante*, at 21. Surely that cannot be. If, as discussed above, the Commandments have a proper place in our civic history, even placing them by themselves can be civically motivated—especially when they are placed, not in a school (as they were in the *Stone* case upon which the Court places such reliance), but in a courthouse. Cf. *Van Orden*, *ante*, at 4 (BREYER, J., concurring in judgment) ("The circumstances surrounding the display's placement on the capital grounds, and its physical setting suggest that the State itself intended the . . . nonreligious aspects of the tablets' message to predominate"). And the fact that at the posting of the exhibit a clergyman was present is unremarkable (clergymen taking particular pride in the role of the Ten Commandments in our civic history); and even more unremarkable the fact that the clergyman "testified to the certainty of the existence of God," *ante,* at 21.

The Court has in the past prohibited government ac-

26  MCCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

SCALIA, J., dissenting

tions that "proselytize or advance any one, or . . . disparage any other, faith or belief," see *Marsh*, 463 U. S., at 794–795, or that apply some level of coercion (though I and others have disagreed about the form that coercion must take), see, *e.g., Lee* v. *Weisman*, 505 U. S., at 592 (prayer at high-school graduation invalid because of "subtle coercive pressure"); *id.*, at 642 (SCALIA, J., dissenting). The passive display of the Ten Commandments, even standing alone, does not begin to do either. What JUSTICE KENNEDY said of the crèche in *Allegheny County* is equally true of the Counties' original Ten Commandments displays:

> "No one was compelled to observe or participate in any religious ceremony or activity. [T]he count[ies] [did not] contribut[e] significant amounts of tax money to serve the cause of one religious faith. [The Ten Commandments] are purely passive symbols of [the religious foundation for many of our laws and governmental institutions]. Passersby who disagree with the message conveyed by th[e] displays are free to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech." 492 U. S., at 664 (opinion concurring in judgment in part and dissenting in part).

Nor is it the case that a solo display of the Ten Commandments advances any one faith. They are assuredly a religious symbol, but they are not so closely associated with a single religious belief that their display can reasonably be understood as preferring one religious sect over another. The Ten Commandments are recognized by Judaism, Christianity, and Islam alike as divinely given. See 13 Encyclopedia of Religion 9074 (2d ed. 2005).[12]

------

[12] Because there are interpretational differences between faiths and

The Court also points to the Counties' second displays, which featured a number of statements in historical documents reflecting a religious influence, and the resolutions that accompanied their erection, as evidence of an impermissible religious purpose.[13]  In the Court's view, "[t]he [second] display's unstinting focus . . . on religious passages, show[s] that the Counties were posting the Commandments precisely because of their sectarian content." *Ante*, at 22.  No, all it necessarily shows is that the

_____

within faiths concerning the meaning and perhaps even the text of the Commandments, JUSTICE STEVENS maintains that *any* display of the text of the Ten Commandments is impermissible because it "invariably places the [government] at the center of a serious sectarian dispute." *Van Orden*, *ante*, at 13 (dissenting opinion).  I think not.  The sectarian dispute regarding text, if serious, is not widely known.  I doubt that most religious adherents are even aware that there are competing versions with doctrinal consequences (I certainly was not).  In any event, the context of the display here could not conceivably cause the viewer to believe that the government was taking sides in a doctrinal controversy.

[13] Posted less than a month after respondents filed suit, the second displays included an excerpt from the Declaration of Independence, the Preamble to the Kentucky Constitution, a page from the Congressional Record declaring 1983 to be the Year of the Bible and the proclamation of President Reagan stating the same, a proclamation of President Lincoln designating April 30, 1863 as a National Day of Prayer and Humiliation, an excerpt from Lincoln's "Reply to Loyal Colored People of Baltimore upon Presentation of a Bible" stating that "[t]he Bible is the best gift God has ever given to man," and the Mayflower Compact. 96 F. Supp. 2d 679, 684 (ED Ky., 2000). The Counties erected the displays in accordance with a resolution passed by their legislative bodies, authorizing the County-Judge Executives "to read or post the Ten Commandments as the precedent legal code upon which the civil and criminal codes of the Commonwealth of Kentucky are founded," and to display alongside the Ten Commandments copies of the documents listed above "without censorship because of any Christian or religious references in these writings, documents, and historical records." Def. Exh. 1 in Memorandum in Support of Defendants' Motion to Dismiss in Civ. A. No. 99–507, p. 1 (ED Ky.) (hereinafter Def. Exh. 1).

28    MᴄCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Sᴄᴀʟɪᴀ, J., dissenting

exhibit was meant to focus upon the historic role of religious belief in our national life—which is entirely permissible. And the same can be said of the resolution. To forbid any government focus upon this aspect of our history is to display what Justice Goldberg called "untutored devotion to the concept of neutrality," *Abington Township,* 374 U. S., at 306 (concurring opinion), that would commit the Court (and the Nation) to a revisionist agenda of secularization.

Turning at last to the displays actually at issue in this case, the Court faults the Counties for not *repealing* the resolution expressing what the Court believes to be an impermissible intent. Under these circumstances, the Court says, "no reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays." *Ante*, at 24. Even were I to accept all that the Court has said before, I would not agree with that assessment. To begin with, of course, it is unlikely that a reasonable observer *would even have been aware* of the resolutions, so there would be nothing to "cast off." The Court implies that the Counties may have been able to remedy the "taint" from the old resolutions by enacting a new one. See *ante*, at 23–24. But that action would have been wholly unnecessary in light of the explanation that the Counties included *with the displays themselves*: A plaque next to the documents informed all who passed by that each display "contains documents that played a significant role in the foundation of our system of law and government." Additionally, there was no reason for the Counties to repeal or repudiate the resolutions adopted with the hanging of the second displays, since they related *only to the second displays.* After complying with the District Court's order to remove the second displays "immediately," and erecting new displays that in content and by express assertion reflected a *different* purpose from that identified in the resolutions, the Coun-

ties had no reason to believe that their previous resolutions would be deemed to be the basis for their actions.[14] After the Counties discovered that the sentiments expressed in the resolutions could be attributed to their most recent displays (in oral argument before this Court), they repudiated them immediately.

In sum: The first displays did not necessarily evidence an intent to further religious practice; nor did the second displays, or the resolutions authorizing them; and there is in any event no basis for attributing whatever intent motivated the first and second displays to the third. Given the presumption of regularity that always accompanies our review of official action, see *supra*, at 18–19 n. 9, the Court has identified no evidence of a purpose to advance religion in a way that is inconsistent with our cases. The Court may well be correct in identifying the third displays as the fruit of a desire to display the Ten Commandments, *ante*, at 24, but neither our cases nor our

───────────

[14] Contrary to the Court's suggestion, see *ante*, at 24, n. 20, it is clear that the resolutions were closely tied to the second displays, but not to the third. Each of the documents included in the second displays was authorized by the resolutions, and those displays, consistent with the resolutions' direction to "post the Ten Commandments as the precedent legal code upon which the civil and criminal codes of the Commonwealth of Kentucky are founded," Def. Exh. 1, consisted of a large copy of the Ten Commandments alongside much smaller framed copies of other historical, religious documents. The third displays, in contrast, included documents not mentioned in the resolutions (the Magna Carta and a picture of Lady Justice) and did not include documents authorized by the resolutions (correspondence and proclamations of Abraham Lincoln and the Resolution of Congress declaring 1983 to be the Year of the Bible).

The resolutions also provided that they were to be posted beside the displays that they authorized. Def. Exh. 1, at 9. Yet respondents have never suggested the resolutions were posted next to the third displays, and the record before the Court indicates that they were not. The photos included in the Appendix show that the third displays included 10 frames—the nine historical documents and the prefatory statement explaining the relevance of each of the documents. See App. to Pet. for Cert. 177a (McCreary County), 178a (Pulaski County).

30    McCREARY COUNTY *v.* AMERICAN CIVIL LIBERTIES
UNION OF KY.

Scalia, J., dissenting

history support its assertion that such a desire renders the fruit poisonous.

\*    \*    \*

For the foregoing reasons, I would reverse the judgment of the Court of Appeals.